# EXHIBIT 1

Patrick Brennan

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                    MIAMI DIVISION
 3    ----------------------------§
      OMAR SANTOS and AMANDA       §
 4    CLEMENTS on behalf of        § Case No. 1:19-cv-23084-KMW
      themselves and all others    §
 5    similarly situated,          §
                                   §
 6         Plaintiffs,             §
                                   §
 7    vs.                          §
                                   §
 8    HEALTHCARE REVENUE RECOVERY  §
      GROUP, LLC, d/b/a ARS        §
 9    ACCOUNT RESOLUTION SERVICES, §
      and EXPERIAN INFORMATION     §
10    SOLUTIONS, INC.,             §
                                   §
11         Defendants.             §
                                   §
12    ----------------------------§
13                      - - -
14               Thursday, May 21, 2020
15                      - - -
16         Remote deposition of PATRICK BRENNAN,
17    commencing at 10:31 a.m., on the above date, before
18    Susan D. Wasilewski, Registered Professional
19    Reporter, Certified Realtime Reporter, Certified
20    Manager of Reporting Services, Certified Realtime
21    Captioner, and Florida Professional Reporter
22                      - - -
23             GOLKOW LITIGATION SERVICES
24         877.370.3377 ph | 917.591.5672 fax
25                 deps@golkow.com
```

Patrick Brennan

```
 1     APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
 2        BARON & BUDD, P.C.
          BY:  ROLAND TELLIS, ESQUIRE
 3             rtellis@baronbudd.com
               JONAS MANN, ESQUIRE
 4             jmann@baronbudd.com
          15910 Ventura Boulevard, Suite 1600
 5        Encino, California 91436
          Phone:  (818) 839-2333
 6        Representing Plaintiffs
 7
 8        McCARTY & RABURN PLLC
          BY:  DENNIS McCARTY, ESQUIRE
 9             dennismccartylaw@gmail.com
               JONATHAN RABURN, ESQUIRE
10             jonathan@geauxlaw.com
          2931 Ridge Road, Suite 101 #504
11        Rockwall, Texas 75032
          Phone:  (225) 412-2777
12        Representing Plaintiffs
13
14        SHEPARD SMITH KOHLMYER & HAND
          BY:  ERNEST H. "SKIP" KOHLMYER, III, ESQUIRE
15             skohlmyer@shepardfirm.com
          2300 Maitland Center Parkway, Suite 100
16        Maitland, Florida 32751
          Phone:  (407) 622-1772
17        Representing Defendant Healthcare Revenue
          Recovery Group, LLC, d/b/a ARS Account Resolution
18        Services
19
20        JONES DAY
          BY:  WILL TAYLOR, ESQUIRE
21             wrtaylor@jonesday.com
          717 Texas, Suite 3300
22        Houston, Texas 77002-2712
          Phone:  (832) 239-3939
23        Representing Defendant Experian Information
          Solutions, Inc.
24
25
```

Patrick Brennan

```
 1    APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

 2        JONES DAY

          BY:  CRISTINA PEREZ SOTO, ESQUIRE

 3            cperezsoto@jonesday.com

          Brickell World Plaza

 4        600 Brickell Avenue, Suite 3300

          Miami, Florida 33131

 5        Phone:  (305) 714-9700

          Representing Defendant Experian Information

 6        Solutions, Inc.

 7

 8    ALSO PRESENT REMOTELY:

 9        JAMES VONWIEGEN, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Patrick Brennan

```
 1                         - - -
 2                     I N D E X
 3                         - - -
 4   Testimony of:  PATRICK BRENNAN                    PAGE
 5       DIRECT EXAMINATION BY MR. TELLIS..............   8
 6       CROSS-EXAMINATION BY MR. TAYLOR............... 102
 7       REDIRECT EXAMINATION BY MR. TELLIS........... 105
 8       RECROSS-EXAMINATION BY MR. TAYLOR............ 110
 9       CROSS-EXAMINATION BY MR. KOHLMYER............ 111
10
11
12                   E X H I B I T S
13              (Attached to transcript)
14    PATRICK BRENNAN DEPOSITION EXHIBITS             PAGE
15   Exhibit 1     Plaintiffs' Amended Notice of        14
                   Deposition of Patrick Brennan Under
16                 Rule 30 of the Federal Rules of
                   Civil Procedure
17
     Exhibit 2     Plaintiffs' Amended Notice of        14
18                 Deposition of Defendant Healthcare
                   Revenue Recovery Group, LLC d/b/a
19                 ARS Account Resolution Services
                   Under Rule 30(b)(6) of the Federal
20                 Rules of Civil Procedure
21   Exhibit 3     (There is no Exhibit 3)
22   Exhibit 4     (There is no Exhibit 4)
23   Exhibit 5     Defendant Healthcare Revenue         26
                   Recovery Group, LLC's First
24                 Supplemental Response to Plaintiffs'
                   First Interrogatories
25
```

Patrick Brennan

```
 1              E X H I B I T S
 2           (Attached to transcript)
 3    PATRICK BRENNAN DEPOSITION EXHIBITS            PAGE
 4    Exhibit 6     Defendant Healthcare Revenue       34
                    Recovery Group, LLC's Second
 5                  Supplemental Response to Plaintiffs'
                    First Interrogatories
 6
      Exhibit 7     Defendant Healthcare Revenue Recovery  44
 7                  Group, LLC's Response to Plaintiffs'
                    First Request for Production
 8
                    HRRG Resp PLRPD#1-Santos.Clements
 9                  0029 through 42
10    Exhibit 8     Defendant Healthcare Revenue       51
                    Recovery Group, LLC's First
11                  Supplemental Response to Plaintiffs'
                    First Request for Production
12
                    HRRG 1st SuppResp PLRPD#1
13                  Santos.Clements 0043 through 105
14    Exhibit 9     Defendant Healthcare Revenue       63
                    Recovery Group, LLC's Second
15                  Supplemental Response to Plaintiffs'
                    First Request for Production
16
                    DF HRRG 2nd Supp ResPL1st RFP
17                  Santos.Clements 0106 and 107
18    Exhibit 10    (There is no Exhibit 10)
19    Exhibit 11    Data Release Agreement             66
20                  SANTOS-EXP 001488 through 1491
21    Exhibit 12    Credit Report                     105
22                  CLEMENTS-EXP 000022 through 51
23    Exhibit 13    Credit Report                     109
24                  CLEMENTS-EXP 000054 through 81
25
```

Patrick Brennan

```
 1              E X H I B I T S

 2           (Attached to transcript)

 3    PATRICK BRENNAN DEPOSITION EXHIBITS           PAGE

 4   Exhibit 14    (There is no Exhibit 14)

 5   Exhibit 15    (There is no Exhibit 15)

 6   Exhibit 16    ACDV Response                     78

 7                 CLEMENTS-EXP 000239 through 241

 8   Exhibit 17    Experian Consumer Assistance - CAPS   78

 9                 SANTOS-EXP 000420 through 435

10   Exhibit 18    Mail Correspondence               75

11                 CLEMENTS-EXP 000012 through 14

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    - - -

 2          THE VIDEOGRAPHER:  We are now on the record.

 3     My name is James Vonwiegen.  I'm a videographer

 4     for Golkow Litigation Services.  Today's date is

 5     May 21st, 2020, and the time is 10:31 a.m.

 6          The remote video deposition is being held in

 7     the matter of Omar Santos vs. [sic] Amanda

 8     Clements vs. HRRG, LLC, for the United States

 9     District Court, for the Southern District of

10     Florida, Miami division.

11          The deponent is Patrick Brennan.  All

12     parties to this deposition are appearing remotely

13     and have agreed to the witness being sworn in

14     remotely.  Due to the nature of remote reporting,

15     please pause briefly before speaking to ensure

16     all parties are heard completely.

17          Will the counsel now please identify

18     themselves.

19          MR. TELLIS:  Good morning.  Roland Tellis

20     with Baron & Budd on behalf of the plaintiffs.

21          MR. RABURN:  Good morning.  Jonathan Raburn

22     on behalf of the plaintiffs from McCarthy &

23     Raburn.

24          MR. MANN:  Jonas Mann from Baron & Budd,

25     also for the plaintiffs.
```

```
 1            MR. KOHLMYER:  Good morning.  Ernest
 2       Kohlmyer on behalf of Healthcare Revenue Recovery
 3       Group, LLC, doing business as ARS Account
 4       Resolution Service.  I'm with the law firm of
 5       Shepard Smith Kohlmyer & Hand.
 6            MR. TAYLOR:  Will Taylor from Jones Day on
 7       behalf of Defendant Experian Information
 8       Solutions, Inc.
 9            THE VIDEOGRAPHER:  The court reporter is
10       Susan Wasilewski and will now swear in the
11       witness.
12            THE COURT REPORTER:  Would you raise your
13       right hand?
14            Do you solemnly swear or affirm the
15       testimony you're about to give will be the truth,
16       the whole truth, and nothing but the truth?
17            THE WITNESS:  I do.
18            THE COURT REPORTER:  Thank you.
19            PATRICK BRENNAN, called as a witness by the
20       Plaintiffs, having been duly sworn, testified as
21       follows:
22                      DIRECT EXAMINATION
23       BY MR. TELLIS:
24       Q.   Good morning, Mr. Brennan.  I just
25       introduced myself.  My name is Rolan Tellis.  I
```

Patrick Brennan

```
 1    represent the plaintiffs and I'm here to take your
 2    deposition today.  Do you understand?
 3        A.   I do.
 4        Q.   You've had your deposition taken before?
 5        A.   Yes, I have.  It's been a while, but I have.
 6        Q.   All right.  Well, since it's been a while,
 7    let me just remind you of a few of the ground rules
 8    so today will go as smoothly as possible.  Okay?
 9        A.   Sure.
10        Q.   First and foremost, you understand you are
11    being -- you're testifying today under oath?
12        A.   I do.
13        Q.   The oath that you were just provided would
14    be the same oath that you'd be given in a court of
15    law.  Do you understand that?
16        A.   I do.
17        Q.   Okay.  And everything that's being said here
18    today is being transcribed by the court reporter and
19    for that reason it's important that we not talk over
20    one another.  Okay?
21        A.   Okay.
22        Q.   Okay.  It's also important that you give me
23    audible responses as opposed to a shaking of the
24    head in one direction or the other so we get a clear
25    transcript.  Understood?
```

Patrick Brennan

```
 1      A.   I do.
 2      Q.   Okay.  If at any time you don't understand a
 3   question I've asked you, please let me know and I'll
 4   do my best to rephrase it.  Okay?
 5      A.   Sure.
 6      Q.   The flip side of that is if you answer a
 7   question I've asked you, I'm going to assume that
 8   you understood it.  Okay?
 9      A.   Okay.
10      Q.   All right.  Your lawyer may make objections
11   from time to time to questions I am asking.  He's
12   doing that to protect the record.  Unless he
13   instructs you not to answer, I'm going to be
14   entitled to an answer to my question.  Okay?
15      A.   Okay.
16      Q.   All right.  Are you on any medication or is
17   there any other reason that you can't give me
18   truthful testimony today?
19      A.   No.
20           MR. TELLIS:  For the court reporter's
21      benefit, we circulated a number of premarked
22      exhibits yesterday.  I don't know that I'm going
23      to use all of them, and so if I skip a number,
24      I'm doing that intentionally.  Just mark it blank
25      for whatever number I skip for whatever number I
```

Patrick Brennan

```
 1      skip.  Okay?

 2           THE COURT REPORTER:  (Indicating.)

 3   BY MR. TELLIS:

 4      Q.   Mr. Brennan, who is your current employer?

 5      A.   I am -- I work for ARS Account Resolution

 6   Services.

 7      Q.   Is that a -- is that a legal entity or is

 8   that a d/b/a that's being used by a different

 9   company?

10      A.   We're a d/b/a of Healthcare Revenue Recovery

11   Group.

12      Q.   And is it okay if I refer to Healthcare

13   Revenue Recovery Group in this deposition as HRRG?

14      A.   Yes.

15      Q.   You'll understand what I mean?

16      A.   Absolutely.

17      Q.   And if I refer to ARS Account Resolution

18   Services as ARS today, you'll understand what I

19   mean?

20      A.   Yes.

21      Q.   Okay.  Is there a defense -- why does HRRG

22   use a d/b/a?

23      A.   The d/b/a was set up for ARS Account

24   Resolution Services to handle later-stage

25   collections.  We're basically a secondary collection
```

Patrick Brennan

1    agency.

2        Q.   Which means that you perform collection

3    services for creditors?

4        A.   We do.

5        Q.   And what does later-stage mean?  These are

6    accounts that are delinquent or --

7        A.   Yes, they're delinquent and they've already

8    been through a first round of collections with a

9    prior agency.

10       Q.   Is HRRG -- does HRRG own this debt that it's

11   seeking to collect, or is it hired by a creditor to

12   collect the debt for it?

13       A.   They are hired by a creditor.

14       Q.   Okay.  And how are they typically paid to

15   collect the debt?  Is it a percentage structure or

16   is it a flat fee or some other --

17       A.   I am not privy to that.  I believe it is a

18   percentage structure.

19       Q.   What is your current title at HRRG/ARS?

20       A.   Assistant Vice President.

21       Q.   How many Assistant Vice Presidents are there

22   in the company?

23       A.   Three.

24       Q.   Who are the others?

25       A.   The others are Kevin Metsgar and Carl

```
 1    Hillard.

 2        Q.   And who is your direct report?

 3        A.   David Friedlander.

 4        Q.   What's his title?

 5        A.   President.

 6        Q.   Is there only one president of the company?

 7        A.   Yes.

 8        Q.   Okay.  And just briefly, what are your

 9   duties and responsibilities as Assistant Vice

10   President?

11        A.   That could be a long list.  I oversee the

12   collection and clerical departments at ARS.  I help

13   to implement policy, enforce policy.  I'm involved

14   in the IT side of things to an extent in that I make

15   sure things are set up the way they need to be.  I

16   do reporting, projecting of revenue.  I manage the

17   floor, the collection staff.

18        Q.   Okay.  Sir, you understand that you are

19   being deposed today as an individual but also as a

20   designated corporate representative for HRRG d/b/a

21   ARS?

22        A.   Yes.

23        Q.   All right.  And let me, for the record,

24   introduce as Exhibit 1 the notice of deposition of

25   Patrick Brennan under Rule 30 of the Federal Rules
```

Patrick Brennan

```
 1    of Civil Procedure.

 2            (Brennan Exhibit 1 was marked for

 3    identification.)

 4    BY MR. TELLIS:

 5        Q.   Have you seen this document before?

 6        A.   I have, yes.

 7        Q.   Okay.  You understand that this is the

 8    document that seeks your deposition here today as an

 9    individual?

10        A.   Yes, I do.

11            (Brennan Exhibit 2 was marked for

12    identification.)

13    BY MR. TELLIS:

14        Q.   Okay.  And I will mark as Exhibit 2 a notice

15    of deposition of defendant Healthcare Revenue

16    Recovery Group, LLC, d/b/a ARS Account Resolution

17    Services, under Rule 30(b)(6) of the Federal Rules

18    of Civil Procedure.  Have you seen this document

19    before?

20        A.   Yes.

21        Q.   And you understand, sir, that this document

22    has several areas of testimony that are contained in

23    the Attachment A beginning on page 3?

24        A.   Yes.

25        Q.   And have you reviewed those areas of
```

Patrick Brennan

```
 1    testimony?

 2         A.   Yes, I have.

 3         Q.   Okay.  And are you here on behalf of the

 4    company to testify as to those areas of testimony?

 5         A.   Yes, I am.

 6         Q.   Okay.  Do you have some familiarity with the

 7    allegations the plaintiffs have made in this case

 8    that you are being deposed in today?

 9         A.   Yes, I do.

10         Q.   Have you reviewed the complaint?

11         A.   Yes, I have.

12         Q.   Okay.  And you're familiar with the written

13    discovery responses that you verified on behalf of

14    HRRG in this case?

15         A.   Yes.

16         Q.   And you reviewed those before today?

17         A.   Yes, I have.

18         Q.   And are you prepared, sir, to testify with

19    respect to the topics that are identified in

20    Exhibit 2?

21         A.   Yes, I am.

22         Q.   Okay.  And can you tell me what you've done

23    to prepare for today's deposition?  Let's start

24    with --

25              MR. KOHLMYER:  Hang on a second.  Subject to
```

Patrick Brennan

```
 1        any preparation in regards to communications or

 2        discussions with counsel, which are protected

 3        by -- hang on a second.  Do you want to change

 4        your question or you want me to finish my

 5        objection?

 6            MR. TELLIS:  Finish your objection and we'll

 7        break it down.

 8            MR. KOHLMYER:  Okay.  Subject to any

 9        communications or directions or consultations

10        with counsel in this case, I instruct you not to

11        answer; however, in preparation for the

12        deposition, if you've taken any steps in

13        reviewing documents in preparation for your

14        testimony, excluding communications or

15        preparation with your counsel, you may answer.

16   BY MR. TELLIS:

17        Q.   All right.  Let's start this way,

18   Mr. Brennan.  Who did you meet with to prepare for

19   your deposition today?

20            MR. KOHLMYER:  I instruct him not to answer.

21            MR. TELLIS:  That -- on what basis?

22            MR. KOHLMYER:  Attorney-client privilege.

23            MR. TELLIS:  That's nonsense.  The identity

24        of who he met doesn't --

25            MR. KOHLMYER:  Let's move.
```

```
 1              MR. TELLIS:  No, no, no.  Excuse me.

 2              MR. KOHLMYER:  Okay.

 3              MR. TELLIS:  Excuse me.

 4              MR. KOHLMYER:  Okay.

 5              MR. TELLIS:  You're here to make -- you're

 6       here to make objections, not to engage me in

 7       colloquy.  The identity of who he met with --

 8              MR. KOHLMYER:  You're right.

 9              MR. TELLIS:  Stop.  Stop.  I'm going to

10       let --

11              MR. KOHLMYER:  You're right.

12              MR. TELLIS:  Are you going to let me finish

13       my objection?

14              MR. KOHLMYER:  You don't have an objection.

15       I've instructed him not to answer the question

16       that's posed.  You can answer another question.

17    BY MR. TELLIS:

18       Q.   Excuse me.  Who did you meet with,

19    Mr. Brennan, outside of your lawyers to prepare for

20    today's deposition?

21              MR. KOHLMYER:  You may answer that question.

22       A.   No one.

23       Q.   So the only people you met with to prepare

24    for today's deposition were lawyers?

25       A.   Yes.
```

Patrick Brennan

```
 1                MR. KOHLMYER:  You can answer that question.

 2       A.   All right.

 3       Q.   When did you meet with your lawyers in

 4    preparation for today's deposition?

 5                MR. KOHLMYER:  I instruct you not to answer

 6         that question.

 7                MR. TELLIS:  On what grounds?

 8                MR. KOHLMYER:  Attorney-client privilege.

 9    BY MR. TELLIS:

10       Q.   How long did you meet with your lawyers in

11    preparation for today's deposition?

12                MR. KOHLMYER:  I instruct you not to answer

13         that question; attorney-client privilege, work

14         product.

15    BY MR. TELLIS:

16       Q.   Who was present during your preparation for

17    today's deposition?

18                MR. KOHLMYER:  You may answer that question.

19       A.   I met with Skip Kohlmyer.

20                MR. TELLIS:  How is that question any

21         different from which lawyers did you meet with in

22         preparation for today's deposition?

23                MR. KOHLMYER:  Your question was to what

24         people you answer -- who participated in the

25         preparation session.
```

Patrick Brennan

```
 1              MR. TELLIS:  Okay.

 2    BY MR. TELLIS:

 3    Q.   You met with Mr. Kohlmyer.  Did you meet --

 4              MR. KOHLMYER:  Let's get to the facts of the

 5       case.  Let's get to the facts of the case and

 6       start -- he's ready to go.

 7              MR. TELLIS:  Excuse me, excuse me.  No.

 8       Listen, you don't tell me how to take

 9       depositions, I don't tell you how to make

10       objections, so I want to proceed --

11              MR. KOHLMYER:  Well, you are, so let's move

12       on.

13              MR. TELLIS:  Don't --

14              MR. KOHLMYER:  Let's move on with the

15       questioning rather than this stuff that you

16       knowingly show as attorney-client work product.

17       So go ahead and ask your question, I'll make my

18       objection.

19              MR. TELLIS:  Mr. Kohlmyer.

20              MR. KOHLMYER:  What?

21              MR. TELLIS:  Mr. Kohlmyer, do you need me to

22       get the magistrate involved?

23              MR. KOHLMYER:  We may.  We may, but go

24       ahead.

25              MR. TELLIS:  Okay.  You are making -- you
```

Patrick Brennan

```
 1      are instructing this witness to answer questions

 2      that are so obviously not privileged.  It's

 3      remarkable.

 4          MR. KOHLMYER:  That's your position.

 5          MR. TELLIS:  But I have to make a record.

 6          MR. KOHLMYER:  That's your legal view.

 7          MR. TELLIS:  I have to make a record, so --

 8          MR. KOHLMYER:  Okay.  Fantastic, and I am

 9      too.  Go ahead.

10  BY MR. TELLIS:

11      Q.  All right.  How long did you meet with

12  Mr. Kohlmyer?

13          MR. KOHLMYER:  I'm instructing you not to

14      answer that question; asked and answered.

15      Q.  Did you -- did you review any documents when

16  you met with Mr. Kohlmyer in preparation for your

17  deposition?

18          MR. KOHLMYER:  Subject to attorney-client

19      privilege, any documentation as far as what you

20      reviewed you may testify to, but not in the

21      context of our communications.

22      Q.  For the moment, it's a yes-or-no question.

23          Did you review any documents when you met

24  with Mr. Kohlmyer in preparation for your deposition

25  today?
```

Patrick Brennan

```
 1              MR. KOHLMYER:  Instruct you not to answer.

 2      Q.   Did any of those documents that you may have

 3   reviewed refresh your recollection of the events

 4   leading up to this lawsuit?

 5              MR. KOHLMYER:  You can answer that one.

 6      A.   Yes.

 7      Q.   Pardon me.  Yes?

 8      A.   Yes.

 9      Q.   Which documents did you review to refresh

10   your recollection?

11              MR. KOHLMYER:  You may answer.

12      A.   Okay.  I reviewed the complaint, I've

13   reviewed the -- our answer.  I reviewed the

14   interrogatory requests and the documents we supplied

15   in response to that.

16      Q.   Okay.  Mr. Brennan, let me ask you a few

17   questions to understand the business that HRRG is

18   in.  You mentioned that you understand HRRG to be

19   retained by creditors to collect debt on their

20   behalf; is that right?

21      A.   Yes.

22      Q.   How does HRRG or ARS obtain the debt or the

23   debt files from these third-party creditors that it

24   is going to collect for -- on?

25      A.   Could you be a little more specific?  I'm
```

Patrick Brennan

```
 1    not sure I understand.

 2         Q.   Yeah.  Does a creditor send over a debt file

 3    electronically?  Does it come in a stack of other

 4    hard copy papers?  How does -- what is the

 5    physical -- what is the way that HRRG actually

 6    obtains these debt files from third-party creditors?

 7         A.   Okay.  Yes.  The files are sent to us

 8    electronically.

 9         Q.   And are they sent via some software system

10    that has a name internally?

11         A.   I -- it -- I'm not an IT person, so, you

12    know, I don't want to give you a bad answer but I

13    believe it's just sent through a secure what they

14    call an FTP file transfer.

15         Q.   Okay.  And are the files sent -- does HRRG

16    and ARS have different physical offices?

17         A.   We're within the same building but we are in

18    different locations within that building.

19         Q.   Okay.  And so with respect to these late

20    stage collection accounts, as you refer to them,

21    those are sent by third-party creditors to ARS?

22         A.   Yes.

23         Q.   Are they sent to a particular person?  Is

24    there a point person that is responsible for

25    collecting those, or does it go to its partner?
```

Patrick Brennan

```
1      A.   We have an IT department that handles the

2  file transfer --

3      Q.   Okay.

4      A.   -- within that department.

5      Q.   All right.  Does ARS do anything to verify

6  the debt information that it receives from these

7  third-party creditors in terms of their accuracy?

8      A.   We run what is -- we call it a data

9  integrity report, where we verify the number of

10 accounts, the balance, we verify the different what

11 we call client classes, because we do handle

12 different types of accounts, and we verify that the

13 data file that was sent matches what we received and

14 what we --

15     Q.   Okay.  Does ARS make any credit inquiries on

16 the debtors in connection with the receipt of these

17 files?

18     A.   No.

19     Q.   Okay.  Does ARS ever purchase credit scores

20 or credit reports on the debtors in connection with

21 obtaining this information from third-party

22 creditors?

23     A.   No.

24     Q.   Okay.  At what point after ARS obtains a

25 debt file from a creditor does it report that file
```

```
 1    to a credit rating agency or a credit bureau?
 2         A.   The accounts are scheduled depending on a --
 3    you know, depending on specifics with certain
 4    clients, but they are scheduled to be reported
 5    60 days after they've been placed with us.
 6         Q.   That's the general practice?
 7         A.   Yes.
 8         Q.   And does that practice vary at all depending
 9    on who the credit -- well, let me back up.
10              Do you report -- does ARS report a debt file
11    to all three credit rating agencies, Equifax,
12    Experian and TransUnion?
13         A.   Yes, we do.
14         Q.   Okay.  And is it the practice to report
15    roughly 60 days after obtaining the file to all
16    three?
17         A.   Yes.
18         Q.   Is there ever an instance where ARS does not
19    report a credit file to one of the reporting
20    agencies?  In other words, are they always reported
21    to all three or are they sometimes not?
22         A.   No, they're always reported to all three.
23         Q.   Okay.  And then let's take Experian for a
24    moment.  Once you have opened a file with Experian,
25    what is ARS's practice with respect to how often you
```

Patrick Brennan

```
 1    update that information?
 2    A.   We generate a monthly file, so information
 3    would be updated on a monthly basis.
 4    Q.   Okay.  And is that updating done manually or
 5    through some automatic software program?
 6    A.   It's done electronically.
 7    Q.   Okay.
 8    A.   Each of the bureaus has a gateway or a
 9    secure method of sending the files electronically.
10    Q.   And what is the name of the gateway that's
11    used at Experian to transmit this information?
12    A.   Again, I don't know if there is a specific
13    name for it.  It's a -- just a secure file transfer
14    process.
15    Q.   Okay.  And is there someone responsible
16    within ARS to make those updates, or is it just done
17    literally through a computer program automatically?
18    A.   It's done electronically but there is an
19    individual who monitors the process and makes sure
20    that it gets completed.
21    Q.   And who is that individual?
22    A.   That would be Gregory Preston.
23    Q.   Okay.  Let me -- let's take a look at some
24    of the responses to the written discovery that was
25    submitted by HRRG in this case.  I just have some
```

Patrick Brennan

```
 1    clarification questions with respect to some of the

 2    answers.  Let me begin by marking as Exhibit 5 a

 3    document entitled HRRG's First Supplemental Response

 4    to Plaintiffs' First Interrogatories.

 5              (Brennan Exhibit 5 was marked for

 6    identification.)

 7    BY MR. TELLIS:

 8         Q.   Have you seen this document before?

 9         A.   Yes, I have.

10         Q.   And just for the record, I'll scroll down to

11    the end, and is -- there's a document entitled

12    "Verification" that says:  "Under penalty of perjury

13    I declare I have read the foregoing responses to

14    interrogatories and the responses are true and

15    correct."

16              Is that your signature?

17         A.   Yes, it is.

18         Q.   Mr. Brennan, are you looking at the screen

19    as I go through this, or do you have the document in

20    front of you in some other manner?  I just want to

21    make sure I'm scrolling it in sufficient time for

22    you to read it.  Sorry?

23         A.   I'm looking at the screen.  I believe I have

24    a printed copy of it, if you prefer I look at that.

25         Q.   No, that's fine.  If for whatever reason I'm
```

Patrick Brennan

```
 1    moving too fast as I'm scrolling down these, or you

 2    want to take a minute to read, just let me know and

 3    you can -- you can do that.

 4         What I'd like you to do is take a look at

 5    the response on page 3 to -- it's this right here,

 6    the First Supplemental Response to Interrogatory

 7    Number 1.  Do you see it there?  I have it on the

 8    screen.

 9    A.   I do.

10    Q.   All right.  Take a second to read that,

11    please.

12    A.   Okay.  I'm going to have to -- I'm trying to

13    minimize the image because I've got a side-by-side

14    view, so if you can give me a --

15    Q.   Sure.

16    A.   Well, I don't think I can because it's your

17    image on the screen.  I don't think I can take

18    control of it.  Let me see here.

19    Q.   Okay.  Well --

20    A.   Just give me a moment.

21    Q.   Yeah.

22    A.   Okay.  Okay.

23    Q.   Okay.  So it says here in a response that

24    you verified under the first supplemental response

25    category that:  "Periodically HRRG furnishes data to
```

Patrick Brennan

```
 1    credit reporting agencies, CRAs, that does not

 2    include any reference to when the account was 'first

 3    reported.'  It is HRRG understanding that Experian

 4    documents the 'first reported date' of an account in

 5    its own internal system which HRRG has no ability to

 6    access, modify, 'reage' or change."

 7         Do you see that?

 8    A.   I do.

 9    Q.   Okay.  On what does HRRG base its

10    understanding that Experian documents the first

11    reported date of an account in its own internal

12    system?

13    A.   Well, you know, just based on general

14    knowledge on how credit reporting works, that most

15    people would see, but the main reason that I would

16    agree with that and did is that we supply the

17    information to the credit bureaus but there is no

18    field entitled "first reported date."

19    Q.   Okay.  Do you know what a first reported

20    date is?

21    A.   Yes.

22    Q.   What is it?

23    A.   It would be the date that a delinquent, or

24    any account for that matter, was first -- first

25    appeared on an individual's credit report.
```

Patrick Brennan

```
 1        Q.   Okay.  So it's your -- it's HRRG's position

 2    that it doesn't report that date in the data that it

 3    provides, that date is created by Experian?

 4        A.   Yes.

 5        Q.   Okay.  And then if you look further down on

 6    the same response, in response to Interrogatory

 7    Number 2, there's a statement that says:  "HRRG did

 8    not 'remove and/or alter prior account and/or

 9    payment history' when it furnished data to Experian.

10    It is HRRG's understanding that Experian maintains a

11    'history' on each account in its system that

12    contains data which HRRG has no ability to access,

13    modify or change."

14             Do you see that?

15        A.   Yes.  I'm just reading through it right now.

16        Q.   Sure.

17        A.   Okay.  Yes.

18        Q.   What, sir, does -- is the basis for HRRG's

19    understanding that Experian maintains a history on

20    each account in its system?

21        A.   Well, again, just based on general knowledge

22    and what you see on an individual's credit report,

23    you know, there is usually a history of the account.

24    However, again, that's not information that's

25    included in the data that we provide to Experian.
```

Patrick Brennan

```
1        Q.   It's not included in that periodic updating

2   of information that you testified about earlier?

3        A.   Correct.  Yes, that's correct.

4        Q.   Okay.  Does HRRG ever remove account history

5   from an account that it reports to Experian?

6        A.   No.

7        Q.   Okay.  Does HRRG ever alter accounts to make

8   them appear more newly reported?

9        A.   No, absolutely not.

10       Q.   Do you know what that practice is generally

11  called, the practice of making accounts appear more

12  newly reported?

13       A.   Yeah.  It's a common term in the industry.

14  It's known as reaging.

15       Q.   All right.  Let's turn to page 4 of these

16  interrogatories, and specifically your response to

17  -- HRRG's, excuse me, response to Interrogatory

18  Number 4.  Please take a minute to review that

19  response.  Let's start with -- well, read the

20  response and then the supplemental response as well,

21  please.

22       A.   I'm going to have to enlarge it a little

23  bit.  Just give me a moment.

24       Q.   You bet.

25       A.   Actually, you'll need to scroll it for me, I
```

Patrick Brennan

```
1    believe, because I've got no --

2        Q.   I'm sorry.

3        A.   That's all right.  I'm at the section that

4    starts with "The 15 data fields" and I was able to

5    read that section and haven't been able to go

6    further.

7        Q.   Okay.  Let me get that to the top so you can

8    read -- why don't you read that paragraph that

9    starts "The 46 data fields" and let me know when

10   you're done and I'll scroll down.

11       A.   All right.  Okay.

12       Q.   Okay.  And then I think the balance of this

13   last sentence here.  Do you see that?

14       A.   Okay.

15       Q.   All right.  So let's scroll back up and

16   let's start with this response.  It says:  "HRRG

17   furnishes data utilizing the Metro2 Format available

18   at www.collect.org."

19            Do you see that?

20       A.   Yes.

21       Q.   Is Metro2 Data the name of the software

22   program that HRRG utilizes to transmit information

23   to Experian?

24       A.   Well, Metro2 is actually a file layout, a

25   format, and that is the format that's supplied
```

Patrick Brennan

```
1     to the bureaus.
2         Q.   Okay.  And it's the format used to supply
3     information to all three bureaus?
4         A.   Correct.
5         Q.   Okay.  And the data fields in that database
6     are the ones that are laid out in the supplemental
7     response that follows that sentence; is that
8     correct?
9         A.   Yes.
10        Q.   And these are the data fields that are
11    utilized by HRRG to furnish data on all the consumer
12    accounts that it is engaged in collection activities
13    on?
14        A.   Yes.
15        Q.   Okay.  And do you see under the 15 -- the
16    sentence that reads:  "The 15 data fields in the
17    Metro2 Header Segment are..."
18             Do you see that sentence?
19        A.   Yes.
20        Q.   And then there is a Number 5, Equifax
21    Identifier, a Number 6, Experian Identifier, and a
22    Number 7, TransUnion identifier.
23             Do you see that?
24        A.   Yes, I see that.
25        Q.   So am I correct that if you are using Metro2
```

Patrick Brennan

```
 1    to report information to Equifax, HRRG would use a

 2    different identifier than if it reports information

 3    to Experian?

 4         A.    Yes.  Each of the bureaus has their own

 5    assigned identifier.

 6         Q.    Okay.  Is the information that gets put into

 7    this Metro2 data generated from an HRRG database

 8    that has a name?

 9         A.    It's generated using our collection

10    software, which is called FACS, F-A-C-S.

11         Q.    Is that the same as Ontario System's FACS?

12         A.    Right.  Ontario is the developer.  FACS is

13    one of their products.

14         Q.    Okay.  And is the information that is

15    contained in the Metro2 data furnished

16    electronically to Experian, or is it some sort of a

17    hard report?

18         A.    No, it's sent electronically.

19         Q.    Okay.  And the Metro2 data is also used to

20    transmit the updated information that gets sent

21    monthly or so to Experian?

22         A.    Yes.

23         Q.    Okay.  Does Experian provide HRRG with sort

24    of a manual or some sort of a guidelines as to how

25    to transmit data to Experian?
```

Patrick Brennan

```
1       A.   I don't know that there is an actual manual.

2   That would be something that IT might be aware of,

3   you know.  There is an agreed upon format, which is

4   the Metro2 format, and then there is an agreed upon

5   method of transfer, and that's, again, handled

6   electronically.

7       Q.   Does Experian provide some sort of training

8   to data furnishers on how to use and transmit data?

9       A.   You know, I honestly -- I'm not sure, to be

10  honest with you.

11      Q.   Okay.  Okay.  Okay.  We can put this one

12  aside and let's bring up Exhibit 6.

13           (Brennan Exhibit 6 was marked for

14  identification.)

15  BY MR. TELLIS:

16      Q.   I've placed on the screen what I've marked

17  as Exhibit 6, which is HRRG's Second Supplemental

18  Response to Plaintiffs' First Interrogatories.

19           Have you seen that document before?

20      A.   I'm not seeing it now.  I'm only seeing the

21  prior document.

22      Q.   Okay.  Just a second.

23           MR. TELLIS:  Jonas, do you know how to share

24      this document?  It's not in the -- it's in the --

25           MR. MANN:  Sure.  Which one do you want,
```

Patrick Brennan

```
 1      which exhibit?

 2              MR. TELLIS:  Exhibit -- Exhibit 6?

 3              MR. MANN:  Which number?

 4              MR. TELLIS:  6.

 5              MR. MANN:  Sure, I'll share it.

 6              MR. TELLIS:  Oh.  Yeah, I'll scroll through

 7      it.  I just need Exhibit 6 itself.  Sorry.

 8              MR. MANN:  You have to stop sharing before I

 9      can share.

10              MR. TELLIS:  Okay.

11              MR. MANN:  All right.

12      BY MR. TELLIS:

13          Q.  Okay.  Do you see it now, Mr. Brennan?

14          A.  Yes.

15          Q.  Okay.

16              MR. TELLIS:  Jonas, I got it.

17              MR. MANN:  Oh.

18              MR. TELLIS:  Oh, I guess I --

19              MR. MANN:  Where do you want me to go?

20      Sorry.

21              MR. TELLIS:  All right.  Go to page 3 under

22      Second Supplemental Response.

23      BY MR. TELLIS:

24          Q.  Mr. Brennan, please look at the response

25      there to the paragraph that's entitled "2nd
```

1    Supplemental Response."

2        A.   Okay.

3        Q.   Drawing your attention to the phrase that

4    says:  "HRRG cannot determine the number of

5    consumers nationwide it reported accounts on to

6    Experian between July 24, 2017 and the present, as

7    HRRG reports to all credit bureaus and cannot

8    distinguish accounts reported to Experian only."

9            Do you see that?

10       A.   Yes.

11       Q.   But in Exhibit 5 I showed you a response

12   which identified some of the data fields in Metro2

13   and one of them was an identifier that was unique to

14   Experian, Equifax and TransUnion.  Do you recall

15   that?

16       A.   Yes, I do.

17       Q.   So given that each of the credit bureaus has

18   a unique identifier, why is HRRG unable to identify

19   the consumers that were reported to Experian?

20       A.   The file layout that we use is gen -- not

21   generic.  It's standard for all three bureaus.  The

22   file is identical to all three bureaus with the

23   exception of, you know, each bureau having its own

24   identifier, and the question also asks between a

25   certain period of time and it's an ever changing

Patrick Brennan

1    number.

2        Q.    But is it an ever changing number concern or

3    is it an inability to distinguish Experian from

4    Equifax or TransUnion?  Because I'm just trying to

5    understand what the point of the identifier is for

6    each of the bureaus if it's not able to be used to

7    distinguish between them?

8        A.    Well, that would be, I guess, an IT issue

9    and I believe it's so the bureaus can determine the

10   file is theirs, but again, the number of accounts is

11   going to be the same for all three every time we

12   send a file.  It doesn't change.

13       Q.    Okay.  Understood.  And HRRG's practice of

14   reporting to all three bureaus doesn't change?

15       A.    That's correct.

16       Q.    Okay.  Is there someone at HRRG who is in

17   charge of IT?

18       A.    Yes.

19       Q.    What's that person's name?

20       A.    That would be Gregory Preston.

21       Q.    Okay.

22            MR. TELLIS:  Okay.  Jonas, can you please

23       scroll down to page 4 at the bottom, the response

24       to Interrogatory Number 5.  Okay?

25       Q.    Mr. Brennan, read as much of that as you'd

Patrick Brennan

```
 1    like but I'd like to focus on the language that

 2    starts midway down the first supplemental response

 3    that says:  "Subject to and without waiving

 4    objection, HRRG did not receive the dispute

 5    letters..."

 6            That section through the end of that

 7    paragraph is what I'm focused on.

 8       A.   Okay.

 9       Q.   So the starting point says:  "HRRG did not

10    receive the dispute letters referenced in Paragraphs

11    39 and 45 of Plaintiff's complaint."

12            Am I correct that HRRG -- well, let me back

13    up.  Does HRRG ever receive hard copies of any

14    dispute letters that are submitted the credit

15    reporting agencies by consumers?

16       A.   Not that I'm aware of, no.

17       Q.   What is your understanding of how HRRG

18    becomes aware of a dispute that a consumer raises

19    with a credit reporting agency?

20       A.   Well, there are several ways that can

21    happen.  It could be as simple as a consumer

22    disputing an account during a telephone

23    conversation, they may mail us a dispute letter

24    directly, but the majority of the disputes that we

25    receive are processed or received through a portal
```

Patrick Brennan

1   called e-OSCAR.

2        Q.    And the information is transmitted by

3   Experian?

4        A.    My understanding of e-OSCAR is that it is a

5   middleman, for lack of a better phrase, for each of

6   the bureaus, so if an individual disputes Experian

7   directly, it is process -- or it is funneled to us

8   through e-OSCAR, yes.

9        Q.    It says in this next sentence:  "Upon

10  receipt of an ACDV from Experian by the e-OSCAR

11  system, HRRG determined if the dispute was specific

12  or not specific."

13            Do you see that?

14       A.    Yes.

15       Q.    Okay.  What does specific mean in this

16  context?

17       A.    A specific dispute -- a specific dispute

18  would be, for example, if they said the balance was

19  incorrect or gave a specific balance that did not

20  match what was being reported.

21       Q.    Is there some document within HRRG or ARS

22  that provides guidances to its employees as to how

23  to determine if a dispute is specific or not?

24       A.    Yes.  There are some training materials that

25  they are provided through e-OSCAR that are used.

Patrick Brennan

```
 1        Q.   And those are training materials provided by

 2   whom -- or prepared by whom?

 3        A.   e-OSCAR.

 4        Q.   And do you believe -- you believe those

 5   training materials have information on there germane

 6   to this issue of determining whether a dispute is

 7   specific or not?

 8             MR. KOHLMYER:  Object to form.  You can

 9        answer if you know.

10        A.   The materials outline the process for

11   responding to any number of disputes, any types of

12   disputes, so to my knowledge, yes.

13        Q.   Okay.  Are ARS or HRRG employees given any

14   training on how to determine if a dispute is

15   specific or not, internally?

16        A.   We train them how to handle disputes, yes.

17        Q.   Okay.  But it's -- just so I understand for

18   purposes of today, a dispute is deemed specific if

19   it contains certain information in it, like whether

20   a balance is correct or not; is that right?

21        A.   Right.  I mean yes, I guess it depends on

22   the definition of specific, but yes, they are

23   trained on how to handle any number of disputes, and

24   depending on the type of dispute it is determines

25   how they should review it and respond to it.
```

Patrick Brennan

```
 1        Q.   Okay.  And so what is not -- what is not

 2   specific described as?

 3        A.   I would describe that as a generic term,

 4   inaccurate information.  I mean, there are any

 5   number of dispute codes that are used within

 6   e-OSCAR, I don't know the exact count, to be honest

 7   with you, but it could be "not mine," "inaccurate

 8   information."  Those are the general generic I would

 9   say nonspecific types of disputes they could respond

10   to.

11        Q.   Okay.  So it says in this sentence that:

12   "If dispute was not specific (Santos and Clements),

13   HRRG verified the identity of the account holder and

14   the account information."

15             Do you see that?

16        A.   Yes.

17        Q.   So am I to read this -- so from -- that the

18   HRRG disputes that were raised by Santos and

19   Clements fell into the "not specific" category; is

20   that right?

21        A.   I, again, would -- I believe so.  It was, as

22   I said, something along the lines of "not mine" or

23   "inaccurate information," then I think we would

24   consider that a not specific dispute.

25        Q.   Okay.  But putting the words Santos and
```

Patrick Brennan

```
 1    Clements in parens next to not specific is intended

 2    to tell the reader that HRRG determined their

 3    disputes were not specific; is that right?

 4         A.   Yes.

 5         Q.   Okay.  Do you know who within the company

 6    made that determination?

 7         A.   I -- off the top of my head, no.  I have

 8    several individuals who process those disputes.  I

 9    would have to look at the individual dispute itself

10    and see --

11         Q.   Okay.  It says, though, if a dispute was not

12    specific, HRRG verified the identify of the account

13    holder and the account information.  What does the

14    last part mean, verified the account information?

15         A.   That would include the key information on

16    the account, who the original creditor was, the

17    balance, when the account was listed with us, the

18    date of delinquency.

19         Q.   When you say verifying, you're verifying it

20    using the data that HRRG has in its systems?

21         A.   Correct.

22         Q.   Okay.  And then it says:  "If the dispute

23    was specific as to account information (Clements),

24    HRRG provided additional account information and

25    updated the account."
```

Patrick Brennan

 1              Do you see that?

 2      A.   I do.

 3      Q.   Okay.  So am I to understand that the

 4  company believed at least one of Clements's disputes

 5  was specific as to account information?

 6      A.   Yes.

 7      Q.   Okay.  And in that case, HRRG provided

 8  additional account information and updated the

 9  account.  What does "updated the account" mean?

10      A.   Okay.  Well, it's kind of a -- I don't want

11  to beat around the bush with the answer but to make

12  it a simple part answer, when we receive a dispute,

13  the information that is confirmed, verified or

14  updated is sent back to e-OSCAR electronically.  So

15  if, for example, we needed to update an address or a

16  balance, that type of thing, then that information

17  is transmitted back from our system.

18      Q.   So updated is also synonymous with

19  corrected.  So, for example, if a consumer says

20  you've got the incorrect address for me and HRRG

21  finds the correct address in the system, that would

22  be considered an update to the account information?

23      A.   With respect to an address?  No.  We report

24  back what we have.

25      Q.   Okay.  So this verification process is

Patrick Brennan

1    literally just looking at the data that HRRG has and

2    reporting it back to the credit reporting agency?

3       A.   Yes, basically.

4       Q.   Okay.  Is this the protocol that's described

5    here in the first supplemental response, is this the

6    protocol that HRRG and ARS uses for all consumers

7    who dispute?

8       A.   Yes.

9            (Brennan Exhibit 7 was marked for

10   identification.)

11           MR. TELLIS:  Okay.  Jonas, can you please

12       pull up Exhibit 7, which is HRRG's Response to

13       Plaintiff's First Request for Production.

14           MR. MANN:  Sure.

15           MR. TELLIS:  And I'd like to take him to the

16       example of what is produced at HRRG Res

17       PLRPD#1-Santos.Clements 0029, which should be the

18       first page attached to the --

19           MR. MANN:  Right here.

20           MR. TELLIS:  No.  Right there.  Okay.

21   BY MR. TELLIS:

22       Q.   Mr. Brennan, would you please take a look at

23   this page for a minute and tell me whether it

24   contains data -- Metro2 data for, in this case, one

25   of the plaintiffs in this case?

Patrick Brennan

```
 1        A.   Yes, it does.

 2        Q.   So is this -- is this a hard copy print of

 3   that Metro2 data, or a screenshot, or something

 4   else?

 5        A.   That's basically a printout of the Metro2

 6   format, yes.

 7        Q.   Okay.

 8        A.   Or a parsed out file, yes.

 9        Q.   All right.  And does HRRG input the

10   numerical values that are on this page?

11        A.   The format is a standardized format.  There

12   is an interface with our software that populates

13   these fields.  You have to create the file, so to

14   speak, but that information is pulled directly from

15   our system, yes.

16        Q.   Okay.  Does HRRG ever delete any of the data

17   that's in Metro2 for a consumer?

18        A.   No.  We're -- it's not possible.

19        Q.   Okay.  Once it's inputted and submitted, it

20   can't be deleted?

21        A.   We -- no, it cannot.

22        Q.   Okay.  And that's true for all consumers

23   that are reported through Metro2?

24        A.   Yes.

25        Q.   Okay.  All right.  Take a look, please --
```

Patrick Brennan

```
 1            MR. TELLIS:  Jonas, can you scroll down to

 2       page 41 of the attachment?  Okay.  Scroll down

 3       for a little bit.  Can you stop there for a

 4       minute?

 5   BY MR. TELLIS:

 6       Q.   I'm showing you a document that was produced

 7   by HRRG that appears to be some sort of a computer

 8   screen with a title "Credit Bureau Disputes - W 325."

 9   Do you see that?

10       A.   Yes.

11       Q.   Do you know what this -- do you know where

12   this page came from, what database?

13       A.   That's actually part of a -- of one of our

14   clerical manuals for handling different duties.

15   It's part of a clerical training manual.

16       Q.   Okay.  So this is a -- pages of a manual

17   that HRRG creates for its employees who are dealing

18   with credit bureau disputes; is that right?

19       A.   Correct.

20       Q.   And are these -- are these screen -- this is

21   a screenshot of a computer system that is used by an

22   employee who is dealing with a dispute; is that

23   correct?

24       A.   Yes.

25       Q.   Okay.
```

Patrick Brennan

```
 1              MR. TELLIS:  Scroll up for a minute, Jonas.

 2        Q.   Mr. Brennan, something was redacted on this

 3   page of this manual.  Do you know -- do you know

 4   what the nature of the information that was redacted

 5   without telling me its content?  I mean, was this

 6   redacted because it pertained to a different

 7   consumer, or do you know what was redacted?

 8        A.   Without looking at the original, no, I don't

 9   know what was redacted.  It wouldn't be related to a

10   consumer.  It might be related to a different area

11   of training.  I'm not sure.

12        Q.   Okay.  Okay.

13              MR. TELLIS:  Scroll down, Jonas, to the

14        second page of this manual.  All right.  Right

15        there.

16   BY MR. TELLIS:

17        Q.   This screen at the top is a box that says

18   "Credit Reporting" and underneath it it says "Credit

19   Reporting Status."  Do you see that?

20        A.   Yes.

21        Q.   Can you -- do you know what software or

22   database contains this screen?

23        A.   Yeah, our collection software, FACS.

24        Q.   FACS.  Okay.  And this is just an example of

25   the type of information that gets inputted with
```

Patrick Brennan

```
 1     respect to a consumer; is that correct?

 2        A.   Yes, correct.

 3        Q.   And underneath, if you look at the first

 4     line, Account 70703230, do you see that?

 5        A.   Yes.

 6        Q.   The first column says -- does that say

 7     "seed"?

 8        A.   Yes, it does.

 9        Q.   And there is a check box.  What does -- what

10     does seed stand for?

11        A.   To give you a short explanation, oftentimes

12     we'll receive multiple accounts for the same

13     consumer, and the software identifies one, for lack

14     of a better word, main account and the others are

15     attached to it.

16        Q.   I see.

17        A.   So seed account would be the main account.

18     The accounts attached to it or called ties.

19        Q.   Okay.  The next column is "Delinquent."

20     What is that referring to?

21        A.   That would be the date of delinquency.

22        Q.   Is that the date of first delinquency?

23        A.   Yes.  We -- we're conservative and we refer

24     to the service date as the date of delinquency.

25        Q.   Does that date ever change once it's
```

Patrick Brennan

```
 1    inputted?

 2         A.    Never.

 3         Q.    Okay.  The next column says "Reported" -- or

 4    not the next column, two columns over say

 5    "reported."  What is that referring to?

 6         A.    That would be the last reported date for

 7    that particular -- the last date it was reported to

 8    the bureaus.

 9         Q.    The last date it was reported to the bureau.

10    Okay.

11         A.    Correct.

12         Q.    And so why are there three columns with the

13    reported dates in it?

14         A.    For each of the three bureaus.

15         Q.    Oh, I see.  And that -- and so the EQU to

16    the left is Equifax, the XPR is Experian, and the TU

17    is TransUnion; is that right?

18         A.    Correct.

19         Q.    Okay.  And do the dates of reported ever

20    change as between the three credit bureaus?

21         A.    I'm not sure I understand your question.

22         Q.    Would there ever be occasion where the

23    reported date for Equifax would be different than

24    the reported date for Experian?

25         A.    The only possible way that I could see that
```

Patrick Brennan

```
 1   happening is if the file was processed and went

 2   from, you know, past midnight, for example.  So I

 3   suppose it's possible it could be one day off, but

 4   I've actually never seen it.

 5       Q.   Okay.  As a general matter, those should be

 6   the same; is that right?

 7       A.   Correct.

 8       Q.   Okay.  And then there is a last column,

 9   "Dispute."  What is that column referring to?

10       A.   That refers to if the account has been

11   disputed.

12       Q.   Okay.  And if it has, you put the letter D

13   in it?

14       A.   Yes.

15       Q.   And if it hasn't been disputed, is it blank

16   or is there a different letter in there?

17       A.   It's actually blank.

18       Q.   Okay.  Okay.  Why don't we take a quick

19   break.  We've been going about an hour, and we will

20   start back in five or 10 minutes, whenever -- how

21   much time do you need, Mr. Brennan?  Is five minutes

22   okay?

23       A.   Five minutes will be perfect.

24            MR. TELLIS:  All right.  Let's take a

25       five-minute break.
```

Patrick Brennan

```
 1            THE VIDEOGRAPHER:  The time is 11:29.  We
 2      are off the record.
 3         (Recess from 11:29 a.m. until 11:38 a.m.)
 4            THE VIDEOGRAPHER:  The time is 11:38.  We're
 5      back on the record.
 6   BY MR. TELLIS:
 7      Q.  Mr. Brennan, I'd like to show you what I'm
 8   going to mark as Exhibit 8.
 9            (Brennan Exhibit 8 was marked for
10   identification.)
11   BY MR. TELLIS:
12      Q.  It is HRRG's First Supplemental Response to
13   Plaintiff's First Request For Production.  Have you
14   seen this document before?
15      A.  Yes.
16      Q.  And just for the record, at the end -- it
17   is -- it's a series of responses and then attached
18   beginning -- well, the first page is Bates numbered
19   HRRG 1st Supp Response PLRPD#1 Santos.Clements 0043.
20            Do you recognize this information?
21      A.  Yes.
22      Q.  The response that accompanied this document
23   refers to this as a Consumer Fact Sheet.  Do you
24   see:  Attached are two Consumer Fact Sheets
25   regarding the accounts of Plaintiff Clements and two
```

Patrick Brennan

```
 1    Consumer Fact Sheets regarding accounts of Plaintiff

 2    Santos.

 3           Do you see that?

 4    A.    Yes.

 5    Q.    Mr. Brennan, do you know where this

 6    information comes from that is used to generate a

 7    Consumer Fact Sheet?

 8    A.    Yes.  It comes from our system, our

 9    software.

10    Q.    What software is that called?

11    A.    FACS.

12    Q.    Okay.  Does HRRG maintain a data dictionary

13    or some other document that helps decipher some of

14    the alphanumeric codes that are in this document?

15    A.    Depending on what you're referring to is --

16    with data dictionary.  That's a much larger item.

17    That's database level.

18           As far as the codes or numeric information

19    that's on there, those are fields within the

20    software, so we do have familiarity with those.

21    Q.    Okay.  Do you have familiarity with this

22    data?

23    A.    Yes, I do.

24    Q.    Okay.  So let's look at this first page.

25    Does this appear to be a Consumer Fact Sheet for
```

Patrick Brennan

```
 1     Plaintiff Amanda Clements?

 2        A.   Yes.

 3        Q.   And in the top right-hand corner it says:

 4     Wait:  September 14, 2018.

 5             Do you know what "wait" means?

 6        A.   Yes.  That's just the date an account would

 7     be followed up on.  It could be actually the date

 8     that that was generated on -- depending on, you

 9     know, different actions that are taken on the

10     accounts, but it's basically what we call a wait

11     date.  It's a date that an account should be

12     followed up on.

13        Q.   Okay.  This information we're looking at is

14     maintained electronically but it appears that the

15     system allows you to run a query and print a record;

16     is that right?

17        A.   Yes.

18        Q.   Okay.  And so there is, in the top left-hand

19     corner, there is an account and the last four is

20     2706.  Do you see that?

21        A.   Yes.

22        Q.   And so would that -- that would be the

23     account number for Ms. Clements?

24        A.   Yes.

25        Q.   Okay.  All right.  And then down below there
```

Patrick Brennan

```
 1    is an Item 1 that has some information, and then an
 2    Item 2 that has some information, right?
 3        A.   Yes.
 4        Q.   And Item 1 has a PRN of 2706, and Item 2 has
 5    a PRN of 8939; is that right?
 6        A.   Yes.
 7        Q.   So that means Ms. Clements, in this
 8    particular instance, has two accounts that are
 9    contained in the FACS database?
10        A.   Yes.
11        Q.   Is this what you were referring to as a seed
12    account?  Would the seed account number be 2706?
13        A.   Generally.  In this case, yes.  If you will
14    notice, there is an asterisk next to either of those
15    numbers.
16        Q.   Yes.
17        A.   Okay.  That denotes seed, but in this case,
18    both of those accounts are -- they're not combined,
19    so they're each individually a seed.
20        Q.   Okay.  But at the top left-hand corner it
21    just refers to Account 2706.  Is that because this
22    particular record pertains to that account and there
23    would be another one for Account 8939?
24        A.   There should be, yes.
25        Q.   Okay.  All right.  Do you see under the
```

Patrick Brennan

```
 1    address for Ms. Clements there are two lines, one of

 2    them has the word "list" and a colon and then some

 3    dates.  Do you see that?

 4        A.   Yes.

 5        Q.   Can you review this document and tell me

 6    what the list date is of February 24th, 2014?

 7        A.   That's the date that that account was placed

 8    with us for collection.

 9        Q.   That's the date the account came from a

10    third-party creditor to ACS?

11        A.   That's the account -- the date the account

12    came to ARS.

13        Q.   Right.  I'm sorry.  ARS from a third-party

14    creditor?

15        A.   Correct.

16        Q.   Okay.  And then what's the SRV date that's

17    next to that?

18        A.   That's the date of service, the date the

19    services were rendered.

20        Q.   Services by whom?

21        A.   The original creditor.

22        Q.   I see.  So if we assume, for example, this

23    is a medical debt at a physician's office, that

24    would be the date that Ms. Clements went and had

25    some service performed?
```

Patrick Brennan

```
1         A.   Yes.

2         Q.   Okay.  All right.  Then go down, please, to

3    line 1 under the heading "Multiple Accounts."  Under

4    the heading "PRN" you see 2706.  Are you with me on

5    that line?

6         A.   Yes.

7         Q.   And if you move over, there is a date that

8    appears in that line of 2/14 -- sorry, 2/24/14.

9         A.   Yes.

10        Q.   Do you see that?  That's the same as the

11   list date that's above.  Is that what -- is that

12   correct?

13        A.   Yes.

14        Q.   Okay.  And then we have a date next to that

15   of 12/20/12, which is the same as the service date

16   above; is that correct?

17        A.   Yes.

18        Q.   Now, can you tell from this document when

19   HRRG first reported this -- these accounts to a

20   credit bureau?

21        A.   It would not appear in this document.  No, I

22   don't believe you can.

23        Q.   Okay.  See below, under the "Notes" section

24   there is a series of dates in a column?

25        A.   Yes.
```

Patrick Brennan

```
 1      Q.   Do those dates bear any relation to the date

 2   this account was first submitted to the credit

 3   reporting agencies?

 4      A.   Not the dates that you're showing, no.

 5      Q.   Okay.  Well, let's scroll down to the first

 6   time there isn't a redaction.

 7           Do you know what this entry is at the bottom

 8   of page 45 that says "7:30 en DI" and then there is

 9   a series of letters?

10      A.   Yes.  That would indicate that we received

11   the dispute on that date.

12      Q.   What is it about that entry that tells you

13   you received a dispute?

14      A.   It's my knowledge of the system.  That

15   window where it says DU885.

16      Q.   Yes.

17      A.   That's what we call a user-defined window

18   and when it's updated, it means we received a

19   dispute.

20      Q.   Okay.  What is the purpose of this Consumer

21   Fact Sheet internally?  How do you use it?

22      A.   We don't have a whole lot of internal use

23   for it, to be honest with you.  It's mainly used to

24   show what activity has taken place on an account.

25   We may use it for coaching with an employee or
```

Patrick Brennan

1   something along those lines.

2       Q.   Okay.  And so if we go to the next page, we

3   see a number of events or entries in this account.

4   Are you telling me that none of those would pertain

5   to the date that the account was reported to

6   Experian, say?

7       A.   Not those notes, no.

8       Q.   Okay.  Are these all entries that have

9   occurred on the account after it was first

10  established and reported to Experian?

11      A.   By looking at the notes, yes, I can tell you

12  that that's the case.

13      Q.   Okay.  Look at this one where -- I don't

14  know, can you see my marker?  But there's a -- I

15  guess not.  There is an entry -- I'll do it this

16  way.

17          There is an entry towards the top of the

18  page as I have -- there's an entry about five lines

19  from the top of the page that says "Marked account

20  for credit bureau removal" on July 14th, 2018, at

21  11:49.

22          Do you see that entry?

23      A.   Yes, I do.

24      Q.   What does that mean, marked account for

25  credit bureau removal?

Patrick Brennan

1    A.    That means the account was flagged to be

2   deleted from the credit report.

3    Q.    And is that at a request by a consumer or

4   something else triggers an entry like that?

5    A.    Well, there could be a number of things that

6   could trigger that.   This was not due to a consumer

7   request, I can tell from the notes.

8    Q.    What is it about the notes that tells you

9   that?

10    A.    Our client requested us to close this

11   account and --

12    Q.    I see?

13    A.    And whenever a client requests closure of an

14   account, we do a deletion.

15    Q.    Okay.  So is that the request to cancel

16   entry that's a few lines above that?

17    A.    Correct.

18    Q.    Okay.  Okay.  Bear with me one second.

19         If a consumer disputed information -- in

20   this case, if Ms. Clements disputed information on

21   her account, how would it be reflected in this

22   document?  Am I looking for a particular code or

23   something else that would identify the fact that she

24   disputed her information?

25    A.    Generally, if it was a dispute that was

Patrick Brennan

```
1    responded to by our staff, they would put a note on

2    the account that they received a dispute and

3    responded to it, depending on the type of dispute.

4         Q.   Okay.

5         A.   I don't -- I'm sorry.  Go ahead.

6         Q.   Okay.  But is that a -- you know, an entry

7    that would say "dispute received and addressed" or

8    would it be some numeric code, do you know?

9         A.   I'm looking through it just to make sure.  I

10   don't want to give you a bad answer.

11        There is a flag that gets set when an

12   account is marked as in dispute.  I'm not positive

13   that it actually shows in the notes like this,

14   though.

15        Q.   Okay.  So look at the screen I've just put

16   up, which is page 46, and you see towards the top of

17   my screen now, a few lines down, on July 14th, 2018,

18   it says "Cleared disputed flag on account."

19        Do you see that?

20        A.   Correct.  Yes.

21        Q.   Does that refer to actions on the part of

22   ARS to address a dispute that was made by

23   Ms. Clements?

24        A.   Actually, in this case, no.  That's in

25   preparation for the deletion request.  Part of the
```

Patrick Brennan

1    procedure is that we clear the dispute when we

2    submit the deletion request.

3         Q.   I see.

4         A.   I believe we show there is a cleared dispute

5    before we delete it.

6         Q.   So once it says "marked account for credit

7    bureau removal," why are there entries that continue

8    after that?

9         A.   Those are -- I'm not 100 percent positive.

10   I'd have to take a closer look at it and look at

11   what was going on with it.  That's not activity that

12   took place by a user, though, I can tell you that.

13        Q.   It's activity by -- that took place by whom?

14        A.   It's the system.

15        Q.   I see.

16        A.   Right.

17        Q.   How can you tell that?

18        A.   If you see the initials NJE to the left.

19        Q.   Yes.

20        A.   That signifies it's a system function.

21        Q.   What does NJE stand for?

22        A.   It's something that was set up by the

23   software vendor.  I honestly don't know what exactly

24   it does stand for.

25        Q.   Okay.  And then above that we see GAP.  What

Patrick Brennan

```
 1    does that denote?

 2        A.   That is an actual user, so that would be

 3    Gregory Preston.

 4        Q.   Okay.  Okay.  Do you see at the top of my

 5    page now it says "Created skip trace request for

 6    demo" on July 14th, 2018?

 7        A.   Yes.

 8        Q.   What is that referring to?

 9        A.   Well, one of the processes that we run on

10    accounts is to monitor for bankruptcy, to find out

11    if a consumer has filed for bankruptcy.  That's also

12    done electronically.  So whenever we close or delete

13    an account, we also delete it from that monitoring.

14    So that's what that means, meaning we're not going

15    to look for bankruptcy on this account anymore.

16    It's closed.  It's deleted.  There is no reason to.

17        Q.   Okay.  Now, let's go to page 76 for a

18    minute.  Scroll down here.  All right.  I'm on page

19    76.  Does this appear to be a Consumer Fact Sheet

20    printout for Plaintiff Omar Santos?

21        A.   Yes.

22        Q.   Okay.  And on this particular case I see on

23    page 82, right in the middle of the page, below the

24    redaction, at November 20th, 2017, it says:  "Set

25    disputed flag on the account."
```

Patrick Brennan

```
 1              Do you see that?

 2      A.    Yes.

 3      Q.    Does that refer to an entry pertaining to a

 4   dispute that was made by Mr. Santos?

 5      A.    Yes.  It was a -- well, it was a dispute

 6   that we received through e-OSCAR, but yes, I would

 7   assume.

 8      Q.    Okay.  So that -- okay.  So that's the type

 9   of entry we would see if a consumer disputed

10   information on an account and it was transmitted to

11   ARS via e-OSCAR?

12      A.    That's one -- one way you would see it, yes.

13      Q.    Okay.  All right.

14              MR. TELLIS:  Let's stop sharing this one and

15      let's bring up Exhibit 9.

16              (Brennan Exhibit 9 was marked for

17   identification.)

18   BY MR. TELLIS:

19      Q.    Mr. Brennan, I've marked as Exhibit 9

20   Defendant Healthcare Revenue Recovery Group, LLC's

21   Second Supplement Response to Plaintiff's First

22   Request for Production.

23              Have you seen this document before?

24      A.    Yes.

25      Q.    Okay.  And I just want to draw your
```

Patrick Brennan

1    attention to -- do you see the supplemental response

2    to Interrogatory Number 2 in the middle of the page?

3    It says:  "To date, HRRG has not located any CDV or

4    ACDV records through e-OSCAR related to the accounts

5    of either Plaintiff; the records could be available

6    from Defendant Experian."

7            Do you see that?

8    A.   I do.

9    Q.   What's the -- if you assume that the

10   plaintiffs disputed their accounts, what explains

11   why HRRG doesn't have a record of any CDV or ACDV

12   records through e-OSCAR related to them?

13   A.   The ACDVs are maintained by e-OSCAR on their

14   database and they are only available for a period of

15   time.  I -- 18 -- 18 months, I believe.

16   Q.   They are only available for a period of time

17   where?

18   A.   On the e-OSCAR database.

19   Q.   Oh, okay.  So when HRRG receives an ACDV

20   through e-OSCAR and it completes a response, does it

21   keep a copy?

22   A.   No.  No, it's all handled electronically.

23   Q.   Okay.  So the only way to obtain information

24   that HRRG put into an ACDV response would be through

25   e-OSCAR, to your knowledge?

Patrick Brennan

1      A.   Yes.

2      Q.   You say at the end of this:  "The records

3    could be available from Defendant Experian."

4           How do you know that?

5      A.   Well, we only maintain them through e-OSCAR.

6    I believe each of the bureaus maintains records for

7    a longer period of time.

8      Q.   Okay.  What do you base that belief on?

9      A.   Just past experience.

10     Q.   Okay.  And then attached to this particular

11   document is a letter that was sent by ARS to

12   Ms. Clements dated July 18th, 2017, Bates numbered

13   106.

14          Do you see right here at the bottom, this is

15   the Bates Number 106?  Do you recognize this letter?

16     A.   I do.

17     Q.   Is this typically the format of a letter

18   that ARS sends to a debtor to advise them that ARS

19   is attempting to collect the debt?

20     A.   Yes.

21     Q.   Okay.  And down at the bottom, sir, here on

22   this letter, there is some information on the bottom

23   and it says:  Creditor, ACS Primary Care Physician

24   SW.

25          Do you see that?

Patrick Brennan

```
 1      A.   Yes.

 2      Q.   And that would be ARS's client?

 3      A.   Yes.

 4      Q.   And then on the far right it says "ServDate

 5   01/31/12."

 6           That's the date that the services were

 7   performed by that client?

 8      A.   Correct.

 9      Q.   Okay.  Is there a -- let's switch gears for

10   a minute.  Is there a contractual relationship

11   between HRRG and Experian?

12      A.   I believe there is a contract between the

13   two entities, yes.

14           (Brennan Exhibit 11 was marked for

15   identification.)

16   BY MR. TELLIS:

17      Q.   Okay.  Let me mark as Exhibit 11 a document

18   entitled "Data Release Agreement," and in the

19   heading it says:  This Data Release Agreement is

20   entered into by Experian Information Solutions, Inc.

21   ("Experian"), and the data provided indicated below

22   the signature line -- data provider.

23           And if I scroll down to the end, it says the

24   data provider is Healthcare Revenue Recovery Group.

25           Do you see that?
```

Patrick Brennan

```
 1        A.    Yes.

 2        Q.    Do you recognize Exhibit 11 as the data

 3    furnishing or data services agreement between HRRG

 4    and Experian?

 5        A.    Yes.

 6        Q.    To your knowledge is this the only contract

 7    that exists between the two entities?

 8        A.    I honestly don't know.  I believe so.

 9        Q.    I don't see anything in this agreement that

10    provides financial terms for the arrangement that's

11    described here, which is the contribution of data by

12    HRRG to Experian.  Do you know what the financial

13    arrangements are between Experian and HRRG that's

14    reflected in this Exhibit 11?

15        A.    I don't believe there is a financial

16    agreement.

17        Q.    Okay.  So what does -- what does -- why

18    does -- why does -- what's the purpose -- what is

19    HRRG's purpose in entering into this agreement?

20        A.    I can only give you my impression.  I didn't

21    sign this agreement, so, you know --

22        Q.    Okay.

23        A.    I believe it's just to maintain uniformity

24    in the information that we supply to them, maybe to

25    outline certain situations that may arise through
```

Patrick Brennan

```
 1   the course of credit reporting and how those would

 2   be dealt with.

 3       Q.   Does HRRG pay Experian for any services that

 4   Experian provides?

 5       A.   Not to my knowledge, no.

 6       Q.   Okay.  And Experian doesn't pay HRRG for the

 7   data that it contributes described in Paragraph 1 of

 8   this Exhibit 11; is that correct?

 9       A.   Not that I'm aware of, no.

10       Q.   Okay.  In Paragraph 1 -- do you see at

11   Paragraph 1, in the middle of this, it starts out:

12   "At Experian's request, Data Provider will promptly

13   verify the accuracy of Data Provider's Records

14   provided to Experian."

15           Do you see that sentence?  There, I've made

16   it blue.  I don't know if you can see that.

17       A.   Yes.

18       Q.   Did Experian ever make such a request to

19   HRRG?

20           MR. KOHLMYER:  Objection to form.  You can

21       answer if you know.

22       A.   Any time we receive a dispute, that would,

23   in my opinion, be a request to verify the

24   information.

25       Q.   Okay.  So any time you receive an ACDV from
```

Patrick Brennan

1    Experian, you view that as a request to verify

2    information, accuracy of information; is that right?

3        A.   Yes.

4        Q.   And you fulfill that responsibility through

5    the mechanism we looked at earlier as to first

6    determining whether it's specific or not specific

7    and then providing certain information; is that

8    right?

9        A.   Yes.

10       Q.   Okay.  Do you see this paragraph here that

11   says:  "Where applicable, Experian and the credit

12   reporting industry expect all data contributors to

13   report collection accounts as 'paid collection'

14   transactions when they are paid."

15            Do you see that?

16       A.   Yes.

17       Q.   And it says:  "The information should not be

18   deleted unless required by law.  Although this may

19   seem like a valuable consumer service and helps you

20   collect on a debt, it is a disservice to our credit

21   granting clients for Experian to allow the deletion

22   of this valuable collection information."

23            Do you see that?

24       A.   I do.

25       Q.   Has HRRG ever deleted information that is

Patrick Brennan

```
 1    described in this Exhibit 11?

 2            MR. KOHLMYER:  Object to form.  You can

 3        answer if you know.

 4        A.    No.

 5        Q.    Do you know why Experian includes this

 6    provision in its contracts?

 7            MR. KOHLMYER:  Object to form.  You can

 8        answer if you know.

 9        A.    No, I don't know.

10        Q.    Okay.  At the bottom it says:  "For these

11    reasons, if your company is deleting valid

12    collection information, or charging fees to delete

13    information, or both, Experian reserves the right to

14    terminate this Agreement immediately and remove Data

15    Provider's Records from our credit reporting

16    system."

17            Do you see that?

18        A.    I do.

19        Q.    Has Experian ever terminated a data services

20    agreement entered into with HRRG?

21        A.    Not that I'm aware of, no.

22        Q.    Okay.  Mr. Brennan, do you know

23    approximately how many disputes HRRG, or ARS in this

24    case, receives in a month?

25            MR. KOHLMYER:  Object to form.  You can
```

Patrick Brennan

```
 1        answer if you know.

 2        A.   I can give you an estimate.  It varies, of

 3   course, from month to month, but I believe right

 4   around 30,000.  No, I take that back.  I'd have to

 5   double-check my figures.  It might be more like

 6   10,000.

 7        Q.   Okay.  And I understand it's an estimate,

 8   but, roughly, it's in the thousands or tens of

 9   thousands with respect to the number of disputes

10   that ARS gets in a given month; is that right?

11             MR. KOHLMYER:  Object to form.  You can

12        answer if you know.

13        A.   In the thousands, yes.

14        Q.   Okay.  Are there a group of employees or an

15   employee at ARS that is tasked with handling

16   disputes?

17        A.   Yes.

18        Q.   Can you give me their names?

19             MR. KOHLMYER:  Object to form.  You can

20        answer if you know.  I don't think there is a

21        time period but --

22        Q.   Well, that's fair.  Let's say in the last

23   five years, do you know of which employees at ARS --

24   tell me what you can remember.  It's not a memory

25   test.
```

Patrick Brennan

```
 1      A.   In the last five years, yeah, there are

 2    numerous.  You know, we've had turnover, of course.

 3    We've --

 4      Q.   When you say numerous, is it more than a

 5    dozen or less than a dozen?

 6      A.   Over five years?  I would say more than a

 7    dozen, sure.

 8      Q.   Okay.  Can you recall the names of any

 9    employees who were tasked with handling disputes at

10    ARS in the last five years?

11      A.   Sure.  Nicholas Greaves, Aurelia Arias, Ruth

12    Melendez, Lisabet Pardo Estrada, Nisha Nurenojet,

13    Chinkere Anderson, Ivana Casias, Candice Bell.  I'd

14    have to check the date but possibly Edward Millsats.

15           Off the top of my head, that's --

16      Q.   That's impressive off the top of your head.

17    Are these all employees of ARS or are they

18    third-party independent contractors?

19      A.   They're employees of ARS, or were.

20      Q.   Are the -- okay.  Is -- did you say Chinkere

21    Anderson; is that right?

22      A.   Chinkere.

23      Q.   Chinkere Anderson.  Is Chinkere Anderson

24    still employed by ARS?

25      A.   No.
```

Patrick Brennan

```
 1      Q.   When was Chinkere Anderson last employed by
 2   ARS, do you know?
 3      A.   No, honestly, I don't.
 4      Q.   Do you know what company or -- do you
 5   know -- do you know where Chinkere Anderson is
 6   today?
 7      A.   No, I don't.
 8      Q.   What city or state?
 9      A.   No, I don't.
10      Q.   Does ARS outsource any of the dispute
11   resolution services to other companies?
12      A.   No.
13      Q.   Okay.  Are -- how are the folks who handle
14   disputes paid?  I guess what I'm getting at is are
15   they -- are they paid on a per dispute basis, or are
16   these salaried or hourly employees whose
17   compensation isn't tied to the number of disputes
18   they resolve?
19      A.   They're hourly employees.
20      Q.   So is there any sort of a commission that's
21   paid to employees that is tied to the number of
22   disputes they handle?
23      A.   No.
24      Q.   Okay.  Are they bonused on that basis?
25      A.   No.
```

Patrick Brennan

```
 1        Q.   Okay.  Do they have quotas, either daily or

 2   monthly, that they have to fulfill in terms of the

 3   number of disputes they handle?

 4        A.   No.

 5        Q.   So when there is a large volume of disputes

 6   and there is a handful of people handling them, do

 7   you have an estimate of how many disputes ARS

 8   employees typically handle in a given day?

 9             MR. KOHLMYER:  Object to form.  You can

10        answer if you know.

11        A.   On average, maybe 200.

12        Q.   Are they literally done on an individual

13   basis, or is there some sort of a batch format that

14   resolves -- that disputes can be sort of resolved on

15   a batch basis?  Do you know what I'm getting at?

16        A.   No, I'm not sure I understand.

17        Q.   Is there a -- is there a protocol or a

18   practice that would allow an employee to resolve

19   disputes en masse?  Is there a program or a system

20   that would allow them, or are they done

21   individually?

22        A.   They're done individually.

23        Q.   Okay.  You understand that the plaintiffs in

24   this case contend that they disputed information on

25   their credit reports, right?
```

Patrick Brennan

```
 1     A.   Yes.

 2     Q.   Just let's look at an example.  Let me pull

 3   up Exhibit 18 for a minute.

 4          (Brennan Exhibit 18 was marked for

 5   identification.)

 6          MR. TELLIS:  Jonas, I don't see Exhibit 18.

 7     Can you pull it up?  Can you scroll down to --

 8     stop there for a minute.

 9   BY MR. TELLIS:

10     Q.   I'm showing you, Mr. Brennan, a letter dated

11   July 26, 2017.  It's sent by Amanda Clements, Bates

12   numbered Clements-Exp 00013.

13          Have you ever seen this document before?

14     A.   I reviewed it, yes.

15     Q.   Did you review it in 2017 -- let me back --

16   when is the first time you reviewed it?

17     A.   I can't tell you the exact date.  It wasn't

18   when it was received but --

19     Q.   Okay.  Was it in connection with this

20   litigation or contemporaneous with the collection of

21   the debt?

22     A.   It was with regard to the litigation.

23     Q.   Okay.  So you don't recall -- do you know

24   whether anyone at ARS reviewed this document at or

25   around the time it was sent in 2017?
```

Patrick Brennan

```
 1        A.   Was it sent to ARS or was it sent to the

 2   bureau?

 3        Q.   That's a good question.  But either --

 4   either if it did and it was then transmitted or not,

 5   do you know whether anyone at ARS ever reviewed the

 6   document itself?

 7        A.   If it was sent directly to us, then it would

 8   have been reviewed, yes.

 9        Q.   When -- when a credit -- let's take

10   Experian.  When Experian sends an ACDV, does it

11   attach the actual dispute letter that let's say it

12   receives from a consumer?

13        A.   In some cases, yes.

14        Q.   Well, if there is no letter attached, what

15   information does ARS utilize to determine if the

16   dispute is specific or not?

17        A.   Well, that goes back to what I was saying

18   about the different codes that are received.  It

19   could say "inaccurate information," "not mine."

20   There are a number of different dispute types.

21        Q.   So am I correct then that the determination

22   of whether a dispute is specific or not at ARS is

23   not determined in every case by reviewing the

24   letter, assuming there was a letter, that was sent

25   in by a consumer?
```

Patrick Brennan

```
 1      A.   Could you ask me that again?

 2      Q.   Sure.  Let's put it this way.  If a letter

 3   was submitted by a consumer to a credit reporting

 4   agency and the credit reporting agency then

 5   transmitted it to ARS as part of an ACDV, would

 6   that -- the contents of that letter be taken into

 7   account by ARS in determining whether the dispute

 8   was specific or not?

 9      A.   Yes, you are required to view any images

10   that are attached to the response, so they would

11   have had to have read it and determined how best to

12   respond to it.

13      Q.   Okay.  And that's part of the protocol or

14   expectation HRRG has of its employees who are

15   resolving disputes?

16      A.   Yes.

17      Q.   Okay.  Looking at this exhibit and reading

18   the sentence that's there:  "Hello, I think the

19   above listed account is not accurate.  I think it

20   has been re-aged.  Please investigate and fix or

21   delete."

22           Do you see that?

23      A.   Yes.

24      Q.   Do you consider that a specific or a not

25   specific dispute?
```

Patrick Brennan

1      A.   I suppose I would consider it specific.

2      Q.   Okay.  And what is it about the letter that

3  would lead you to be believe it's specific?

4      A.   Well, they have a specific dispute.  It's

5  not a generic "this isn't mine," "I don't owe it,"

6  "it needs to be redacted."

7      Q.   Okay.  So let's look at an ACDV for a

8  minute, Exhibit 17, if I can click that off and go

9  to Exhibit 17.

10          (Brennan Exhibit 17 was marked for

11  identification.)

12  BY MR. TELLIS:

13      Q.   Mr. Brennan, I've placed -- I've marked as

14  Exhibit 17 a document Bates numbered on the first

15  page Santos-Exp 000421.

16          MR. TELLIS:  Actually, let's skip that for a

17      minute.  I'm sorry, Madam Court Reporter.  I'm

18      going to go to Exhibit 16 instead.

19          (Brennan Exhibit 16 was marked for

20  identification.)

21  BY MR. TELLIS:

22      Q.   This is an ACDV Bates numbered Clements-Exp

23  00241 through -- actually, the last page is 241.

24  You'd think I've taken a deposition before.  239

25  through 241.  Do you see this document?

Patrick Brennan

```
 1      A.   Yes.

 2      Q.   And does this appear to be -- at the top of

 3   the page it says "ACDV Response," and below that,

 4   under "Consumer identification," it says "Amanda

 5   Clements."

 6           Do you see that?

 7      A.   Yes.  I'm going to enlarge it just a bit, if

 8   you can give me a moment.

 9      Q.   Sure.

10      A.   Okay.

11      Q.   Now, this appears -- does this appear to you

12   to be an ACDV response that was completed by ARS

13   with respect to Plaintiff Amanda Clements?

14      A.   Yes, it does.

15      Q.   Okay.  On the top left-hand corner there is

16   a run date of February 21st, 2008.  Do you see that?

17      A.   Yes, 2018.

18      Q.   I'm sorry, 2018.  What is a run date?

19      A.   You know, I've not been asked that.  I'm not

20   sure if that's the date that we responded or the

21   date that it was received.

22      Q.   Okay.  Then look at the dates on the far

23   right under the column "Date Sent."  May 9th, 2017,

24   what is that date referring to?

25      A.   Okay.  That would be the date that it was
```

Patrick Brennan

1    sent to us, I believe.

2        Q.   Okay.  By whom?

3        A.   By e-OSCAR.

4        Q.   Okay.  And then there is a due date of

5    May 25th, 2017.  What date is that?

6        A.   That would be the date that we are expected

7    to respond to it by.

8        Q.   Okay.  And there is, in bold, a DNR date of

9    May 25th, 2017 also.  What is a DNR date?

10       A.   I believe it stands for did not respond

11   date.  I'm not positive of that.  It's basically the

12   date that it was due and I believe if it's not

13   responded to by that date, then it's considered a

14   nonresponse.

15       Q.   Okay.  Okay.  So let's -- let's -- the

16   document -- the dispute letter I showed you a moment

17   ago for Ms. Clements, which we marked as Exhibit 18,

18   was dated July 26, 2017.  Judging from the dates on

19   the right-hand side here, do you believe this

20   response that we're looking at on page 239 followed

21   that dispute if the date of that dispute was

22   July 26th, 2017?

23       A.   No.

24       Q.   And that's because these dates that are in

25   the right-hand corner precede July 26th, 2017,

Patrick Brennan

1    right?

2        A.   Correct.

3        Q.   All right.  So then let's go to the next

4    one, which is on 240.  Do the dates that are

5    contained in the right-hand side here lead you to

6    believe that this response was prepared following

7    the July 26, 2017 dispute letter?

8        A.   I'm sorry.  Could you repeat the question?

9        Q.   Yeah.  I showed you on -- I showed you on

10   Exhibit 7 -- 18 that Ms. Clements sent a dispute

11   letter that was dated July 26th, 2017.

12       A.   Right.

13       Q.   If you assume that created an ACDV that came

14   to ARS, looking at the dates that are on the

15   right-hand side here on page 240, do you believe

16   this response was generated following the receipt of

17   that letter?

18       A.   No.

19       Q.   Okay.  Then let's go to the third page here,

20   which is Bates numbered Clements-Exp 241, and you

21   see on the right-hand side here you now have dates

22   that are in August of 2017?

23       A.   Yes.

24       Q.   Do you believe that this ACDV response

25   followed the Exhibit 18 letter that was dated

Patrick Brennan

```
 1    July 26, 2017?

 2        A.   Well, yes, it followed it.  I don't know if

 3    it was directly as a result of that letter or if

 4    there was another dispute in between, but it

 5    definitely followed the letter.

 6        Q.   Okay.  All right.  Now, the letter I sent

 7    you -- well, skip that.

 8             So on this particular page, there's -- at

 9    the top in the middle it says "Document Viewed" and

10    there is a letter Y in it.  Do you see that?

11        A.   Yes.

12        Q.   What is that referring to?

13        A.   I believe that means that there was a

14    document attached to the dispute and that the

15    responder did view the document.

16        Q.   Okay.  And as I think you testified earlier,

17    it's your expectation or the company's expectation

18    that if documents were attached to an ACDV, the

19    person handling the dispute would be reviewing that

20    document; is that right?

21        A.   Correct.

22        Q.   Okay.  So in this case, can you tell from

23    this document who was assigned to address or resolve

24    this particular ACDV?

25        A.   Chinkere Anderson.
```

Patrick Brennan

```
 1      Q.   Okay.  And you see that in the right-hand

 2   side under "Authorized Verifier."  Is that right?

 3      A.   Correct.

 4      Q.   Okay.  If a person did not view any

 5   documents that were attached to the ACDV, what would

 6   be contained in the box to the right of the row

 7   "Document Viewed"?  Would it say N or would it be

 8   blank?

 9      A.   I honestly don't know.  I believe it is

10   blank.

11      Q.   Okay.  All right.  This particular ACDV

12   pertains to, in the middle of the page, Account

13   Number 71788939.  Is that right?

14      A.   Yes.

15      Q.   Okay.  Now, at the bottom -- or the middle

16   of the page there are three columns.  The far right

17   column says "Consumer Claims," the middle column

18   says "On Profile," and the left-hand column says

19   "Subscriber Response."

20           Do you see that?

21      A.   Yes.

22      Q.   Okay.  What is the column that is entitled

23   "On Profile" referring to?

24      A.   I believe that is what the bureau is showing

25   on their profile of this particular account.
```

Patrick Brennan

```
1      Q.    Okay.  And then to the left, "Subscriber's

2   Response" is referring to whose information?

3      A.    That would be our response, ARS.

4      Q.    All right.  So in those two columns, about

5   the bottom of the page -- the bottom third of the

6   page is an entry called "Open Date" and it has a

7   date of March 25th, 2013.  Do you see that?

8      A.    Yes.

9      Q.    What is that date referring to?

10      A.    That should correspond with the date the

11   account was listed with our office.

12      Q.    Okay.  That's the date that your office

13   opened an account that was submitted to it by a

14   creditor; is that right?

15      A.    Correct.

16      Q.    Is there a date on this document that we're

17   looking at that would reflect the date that that

18   account was first submitted to Experian?

19      A.    I don't believe so.

20      Q.    Okay.

21      A.    I can't see the whole document, but from

22   memory I don't recall there was a first reported

23   date on there.

24      Q.    Okay.  But you opened the account on

25   March 25th, 2013, and I think you testified earlier
```

Patrick Brennan

```
1    it would have been your expectation that information

2    on this account would have been submitted to

3    Experian approximately 60 days later; is that right?

4        A.    Correct.

5        Q.    So that would have put us in May or so of

6    2013.

7             On the middle -- on the top part of that

8    same area we're looking at there is a "Balance" line

9    that has a date under the "On Profile" -- in the "On

10   Profile" column of July 11, 2017.  Do you see that?

11       A.    Yes.

12       Q.    Do you know what that date is referring to?

13       A.    I would -- that's, again, what the bureau is

14   showing on their profile, so I would be assuming,

15   but I'd have to say it's the date that they show

16   that the balance was verified last.

17       Q.    Okay.  So when an ACDV like this comes to

18   ARS for a response, the information in the "On

19   Profile" column is already populated as it's

20   reflected here; is that right?

21       A.    I believe so, yes.  Well, I don't -- I

22   actually -- the ACDVs are created in response, you

23   know, but I believe that information is there, yes.

24       Q.    Okay.  And then ARS provides its response in

25   the column "Subscriber Response," right?
```

Patrick Brennan

```
 1      A.    Correct.

 2      Q.    Okay.  Do ARS employees receive training on

 3   the preparation of an ACDV response?

 4      A.    Yes.

 5      Q.    Who does that training at ARS?

 6      A.    Well, the training is done through e-OSCAR.

 7   They have an online portal and then documentation.

 8   We have a team lead who has been with us for a long

 9   time, so when we bring someone new in, they

10   generally train with the team lead.

11      Q.    What about FCRA compliance?  You know what

12   FCRA is, right?

13      A.    Yes.

14      Q.    What is FCRA?

15      A.    Fair credit reporting.

16      Q.    Do ARS employees receive any training on

17   FCRA compliance?

18      A.    Yes.

19      Q.    Who does that training?

20      A.    That's handled by one of our training

21   supervisors.

22      Q.    And in the past five years has it been the

23   same person or is that -- is there turnover in that

24   position as well?

25      A.    It's been the same person.
```

1      Q.   Who is that person?

2      A.   That would be Kathleen Jadad.

3      Q.   And how often does that training occur?

4      A.   That training is given whenever someone

5   starts with us and then we do an annual review.

6      Q.   And is it done on an individual employee

7   basis or is it done in a group setting?

8      A.   It depends on the situation.  If we had

9   several new hires, then it would be a group

10  situation.  If it's just one person, then it would

11  be one-on-one.

12     Q.   So if it's done on an annualized basis,

13  would it be safe to say that the last one that

14  occurred was in 2019?

15     A.   Yes.

16     Q.   Okay.  Is there a time of the year that it's

17  typically done?

18     A.   It's generally done in or around June or

19  July.  I don't recall the exact date we did it.

20     Q.   Are there written materials that are

21  prepared for that training?

22     A.   I believe so, but it is an online training

23  program as well.

24     Q.   Does ARS sort of conduct any audits on FCRA

25  compliance?

Patrick Brennan

```
 1      A.   We do call audits, yes.

 2      Q.   What's a call audit?

 3      A.   We routinely audit telephone calls of our

 4   agents handling collection calls to make sure that

 5   they are in compliance.

 6      Q.   Okay.  And then is there an audit report

 7   that's prepared?

 8      A.   Yes.

 9      Q.   And how often is that done?

10      A.   Audits are done daily.

11      Q.   Is there someone in the company that's in

12   charge of auditing for FCRA compliance?

13      A.   Yes.

14      Q.   Who is that person?

15      A.   Again, it'd be Kathleen Jadad.

16      Q.   Okay.  Does H -- does ARS receive more

17   disputes from one credit bureau versus another?

18           MR. KOHLMYER:  Object to form.  You can

19      answer if you know.

20      A.   I honestly don't know.

21      Q.   Let's turn back to this ACDV for a minute.

22   So in the "Dispute Reason" box at the top of the

23   page, it says:  "112 - Claims inaccurate

24   information.  Did not provide specific dispute.

25   Provide complete ID and verify account information."
```

Patrick Brennan

1          Do you see that?

2     A.   Yes.

3     Q.   Who enters that information on this ACDV

4     response?

5     A.   I'm not sure if that's entered by the bureau

6     or e-OSCAR, but one of the two.

7     Q.   But it's your testimony that that's not

8     entered by HRRG or ARS?

9     A.   Correct.

10     Q.   Okay.  And then does ARS or HRRG rely on

11     that dispute reason to determine how to respond to

12     an ACDV?

13     A.   Yes.

14     Q.   Okay.  So in this particular case, either

15     e-OSCAR or the credit bureau determined that this

16     particular dispute was not specific; is that right?

17     A.   That's what the document says, so yes, I

18     would assume so.

19     Q.   And that determination influences the way in

20     which HRRG responds?

21     A.   Yes.

22     Q.   Does HRRG or ARS do anything to determine

23     whether that's accurate, the assessment that's

24     stated there as the dispute reason?

25     A.   No, that's provided to us.  We assume it's

Patrick Brennan

```
 1   accurate but --

 2       Q.   Okay.  So if you assume that there was a

 3   dispute letter attached to this document that was

 4   viewed by -- is that Ms. Anderson or Mr. Anderson?

 5       A.   Ms.

 6       Q.   So if you assume that Ms. Anderson reviewed

 7   the document that was attached, for what purpose was

 8   she reviewing it?

 9       A.   To review it to see if there was any

10   specific information in the dispute.

11       Q.   And if she disagreed with the assessment as

12   to whether it was specific or not, what did you --

13   did you have an expectation of what she would do

14   about that?

15       A.   I'm not sure I understand the question.

16       Q.   Well, this "Dispute Reason" category says

17   "did not provide specific dispute," right?

18       A.   Correct.

19       Q.   If a reviewer reviews a document that's

20   attached that suggests that the bureau or e-OSCAR

21   got that wrong, what do they do about it?

22       A.   Well, they're going to base their response

23   on the document.

24       Q.   On the attached document?

25       A.   Correct.
```

Patrick Brennan

 1      Q.   Not this assessment that's done by the

 2   credit bureau or e-OSCAR?

 3      A.   Correct.  Again, it's a code.  There are

 4   multiple codes and I believe in a lot of cases they

 5   are considered generic, but yes.

 6      Q.   Okay.  So I just want to make sure I got

 7   this right, because I think you testified

 8   differently earlier.

 9           So does ARS rely on the description of the

10   dispute as being specific or not that is made in

11   this box by the bureau or e-OSCAR in determining how

12   to respond?

13      A.   Let me clarify.  Do you see the code 112?

14      Q.   Yes.

15      A.   Okay.  And then there is a general

16   description of the dispute reason.  There are

17   multiple codes, so yes, the codes are looked at and

18   the documents are looked at.  Each is looked at and

19   the codes determine more than the description?

20      Q.   Okay.  So under "Response" in the middle of

21   the page, it says:  "24 - Change-Cons disp not

22   specific:  ID verified.  Account info verified."

23           Do you see that?

24      A.   I do.

25      Q.   Who entered that information on this

Patrick Brennan

1    response?

2        A.   That would have been Chinkere Anderson.

3        Q.   Okay.  So is that -- is that code driven as

4    well, she gets to pick from a menu of codes and in

5    this case she picked number 24 and that's the

6    description that is identified -- or that is

7    associated with code 24?

8        A.   Yes.  Correct.

9        Q.   Okay.  And what does "Cons disp" mean?

10       A.   Well, I believe there is a hyphen there.  So

11   I believe it's "change hyphen," and I'm assuming

12   that "Cons disp" means consumer dispute.

13       Q.   So this says "change consumer dispute not

14   specific," is that how I'm supposed to read that?

15       A.   Yes.  I don't know if "change" goes along

16   with the 24 meaning, it's a change to a prior

17   response code, but yes, "24 - change consumer

18   dispute not specific," yes.

19       Q.   So Ms. Anderson chose that code after

20   reviewing the information that she received from

21   e-OSCAR; is that right?

22       A.   Correct.

23       Q.   Okay.  And then it goes on to say:  "ID

24   verified.  Account info verified."

25       A.   Correct.

Patrick Brennan

 1     Q.   Right?

 2     A.   Yes.

 3     Q.   Okay.  That is -- that is referring to an

 4   act that was taken on the part of Ms. Anderson.  She

 5   identified -- she verified the identity and the

 6   account info; is that correct?

 7     A.   Correct.

 8     Q.   And then she populates the information

 9   that's in the subscriber response?

10     A.   I don't know if it's prompted by the

11   response itself or if they manually go in and do

12   that.  I'd have to double-check.

13     Q.   Okay.  Okay.

14     A.   There may still be information there.

15     Q.   Okay.  And then down at the bottom of the

16   page there are two grids.  One is called a "Response

17   History Grid" and one is "On-File History Grid."

18   Right?

19     A.   I can't see it.

20     Q.   You can't see the -- can you see below the

21   "Subscriber Response" column at the bottom third of

22   the page there are --

23     A.   The last thing that I can see is the

24   open-close date towards the bottom there, unless

25   it's in there and I'm not seeing it.

Patrick Brennan

```
 1        Q.   Where do you see open close date?

 2        A.   Correct.  The bottom line of the document

 3   that I can see from my end says "Open Date, Closed

 4   Date, 3/25/2013."

 5        Q.   Oh, yeah.  Okay.  So are you able to see my

 6   screen?

 7        A.   Yeah.  I'm looking at the document.  I'm

 8   just saying I can't see the section you're referring

 9   to.  I think you might need to scroll it.

10             MR. MANN:  Is your window not maximized?

11   Because I can see the whole document.

12        Q.   Can you --

13        A.   Let me try.  Give me one second.  Yeah, I

14   have it at 100 percent.  Let me try something else

15   here.  Give me one second.  All right.  Give me one

16   second.

17        Q.   Sure.

18        A.   Yeah, there is a tool bar.  I'm trying to

19   get around it here.  I apologize.  Just give me a

20   moment.

21        Q.   Sure.  No problem.

22        A.   It doesn't matter how much I zoom it, I

23   still can only see that section.  I don't know what

24   I'm doing wrong.  I'm not able to -- the document

25   itself.
```

Patrick Brennan

```
 1              MR. TELLIS:  Jonas, are you able to bring up

 2        one on your side?  Maybe that helps.

 3              MR. MANN:  I can also -- I can e-mail you

 4        the document directly and you can open it in a

 5        separate -- your regular -- your computer -- in

 6        Acrobat if you want.

 7              MR. KOHLMYER:  Whatever you prefer.

 8              MR. MANN:  Or if you have them printed out,

 9        you can look at --

10        A.   Oh, wait.  There we go.  Never mind.  I got

11   it.  I got it.  I apologize.  I'm not -- I have it.

12        Q.   That's fine.  No problem.  Okay.  So you see

13   the bottom third or so of this document there are

14   two grids, one is called "Response History Grid" and

15   one is "On-File History Grid"?

16        A.   I do, yes.

17        Q.   Okay.  What is the -- what are those two

18   grids intended to refer to?

19        A.   I would --

20              MR. KOHLMYER:  Object to form.  You can

21        answer if you know.

22        A.   I'm not completely certain of what those for

23   -- are for.

24        Q.   Well, who completes the On-File History Grid

25   and who completes the Response History Grid, do you
```

Patrick Brennan

```
 1    know?

 2         A.   I would believe that the bureaus complete

 3    the On-File History Grid and that the Response Grid

 4    is completed in regards to our responses.

 5         Q.   Do you know, in the Response History Grid

 6    that ARS typically completes, do you know what is

 7    typically contained in the boxes under the months

 8    and years, are they letters or numbers or something

 9    else?

10         A.   I honestly don't know.

11         Q.   So you don't know what choice of information

12    Ms. Anderson, let's say, had to complete this

13    Response History Grid?

14         A.   I don't believe that she actually goes into

15    the grid itself and deletes anything.  I think that

16    it's supposed to be autopopulated by the response.

17         Q.   Right.  So if we assume that this grid is

18    intended to show the history of this particular

19    account, how could it be blank in August of 2017 if

20    this account was opened back in 2013?

21              MR. KOHLMYER:  Object to form.  You can

22         answer if you know.

23         A.   I don't know.

24         Q.   Do you -- have you ever seen an ACDV where

25    information was included in the Response History
```

Patrick Brennan

```
 1    Grid?

 2         A.   Not that I recall, no.

 3         Q.   Okay.  I take it that if there are a

 4    choice -- if there is sort of a menu of codes or

 5    letters that can be used to complete the Response

 6    History Grid, they would be in the training

 7    materials or the software materials used to respond

 8    to an ACDV?

 9         A.   If it's an available -- or something that

10    our responders are responsible for, it should be in

11    there, yes.

12         Q.   Okay.  Do you know the process?  So, for

13    example, when we look at the response we looked at,

14    there is a Code Number 24 and then there is a

15    response.  Is that manually typed in or are there

16    dropdown menus in e-OSCAR that allows you to click

17    and fill?

18         A.   I believe it's a dropdown menu, but without

19    actually seeing it, I'm not 100 percent certain.

20         Q.   Okay.  Is it -- is it surprising to you that

21    an account that had a history of some four years

22    before this particular ACDV was prepared would have

23    nothing in the response history grid?

24              MR. KOHLMYER:  Object to form.  You can

25         answer.
```

Patrick Brennan

```
1       A.   Am I surprised by it?  I don't know what

2   it's specifically used for, so, no, I'm not

3   surprised.

4       Q.   Okay.  You don't.  Who in the company would

5   be most knowledgeable about what is supposed to go

6   into this Response History Grid on an ACDV?

7            MR. KOHLMYER:  Object to form.  You can

8       answer if you know.

9       A.   Again, I don't believe this is something

10  that we're responsible for, so I don't know.  I

11  would have to check with the individuals or possibly

12  their team lead to see if it's something they are

13  trained on.

14      Q.   You don't think that a column entitled

15  Response History Grid is something that ARS is

16  responsible for?

17      A.   Again, as I said, I don't know what this is

18  for, so I would have to do some checking to find

19  out.

20      Q.   Okay.  Is there someone you would typically

21  call to find out that information?

22      A.   I could ask my team lead if this is

23  something that they fill out, yes.

24      Q.   Who is your team lead?

25      A.   Her name is Aurelia Arias.
```

Patrick Brennan

```
 1        Q.   Was she the team lead in 2017?

 2        A.   Yes.

 3        Q.   Mr. Brennan, has ARS had any communications

 4   with Experian about the way its data is reported?

 5   And more specifically, you understand that in this

 6   case the plaintiffs contend that certain information

 7   contained in their credit profiles and credit

 8   reports are incorrect, mainly the data status and

 9   the first response date, you understand that, right?

10        A.   Yes.

11        Q.   Has anyone at ARS ever discussed that issue

12   with anyone at Experian, to your knowledge?

13        A.   How the information is being reported?

14        Q.   Yes.

15        A.   Yes.

16        Q.   Who has had that conversation?

17        A.   Any conversations regarding the data would

18   be handled by Gregory Preston.  He works directly

19   with each of the bureaus.

20        Q.   And do you know whether Mr. Preston has

21   discussed the issue that the plaintiffs complain

22   about here with anyone at Experian?

23        A.   I'm not certain if he has or hasn't, no.

24        Q.   Okay.  Has the issue that the plaintiffs

25   complain about here, namely the changing of dates of
```

Patrick Brennan

```
1    status and first report -- first report dates and

2    the deletion of account histories, has that ever

3    been raised with respect to any other credit

4    reporting agency that you're aware of?

5        A.   No, it hasn't.

6        Q.   Okay.  Prior to the filing of the complaint

7    that we're taking your deposition in today, had you

8    ever heard of this issue that the plaintiffs are

9    complaining about, namely that Experian is changing

10   certain dates, data status, first reported date, and

11   deleting account history?

12       A.   No.

13       Q.   Are you aware that ARS and Experian were

14   sued by more than a dozen plaintiffs two years or so

15   ago, in 2018, in Texas in a case complaining about

16   similar issues?

17       A.   I don't recall the case.

18       Q.   Okay.  Have you ever been deposed in an

19   action where the plaintiffs were alleging that

20   Experian had changed dates of status and first

21   report dates on their credit profiles?

22            MR. KOHLMYER:  Object to form.  Are you

23       referring to him individually?

24            MR. TELLIS:  Yes.

25            MR. KOHLMYER:  You can answer if you know.
```

Patrick Brennan

```
 1      A.   No.

 2      Q.   Has HRRG made any changes to the way it

 3    completes ACDV responses with respect to information

 4    obtained by Experian in the last five years?

 5           MR. KOHLMYER:  Object to nature of the form.

 6      To the extent that any changes were at the

 7      direction of counsel or legal advice, I instruct

 8      you not to answer.  Outside of that, you're

 9      welcome to answer.

10      A.   The bureaus will -- well, periodically the

11    codes will change, the response and dispute codes,

12    so those are updated, and, of course, we change to

13    reflect that.

14      Q.   Okay.  But has Experian ever asked ARS or

15    HRRG to change the way it reports information, say,

16    pertaining to the dates of delinquency on consumers'

17    accounts?

18      A.   Not that I'm aware of, no.

19      Q.   Has Experian ever asked ARS to change the

20    manner in which it responds to ACDVs in the past

21    five years?

22      A.   Not that I'm aware of, no.

23      Q.   Okay.

24           MR. TELLIS:  Let's take a quick break and,

25      Mr. Kohlmyer, I'm probably nearing the end of my
```

Patrick Brennan

1     questioning.

2          MR. KOHLMYER:  Okay.  Thank you.

3          THE VIDEOGRAPHER:  The time is 12:52.  We

4     are off the record.

5       (Recess from 12:52 p.m. until 1:02 p.m.)

6          THE VIDEOGRAPHER:  The time is 1:02.  We are

7     back on the record.

8          MR. TELLIS:  Mr. Brennan, those are the

9     questions I have for you today.  Thanks for your

10    time.

11         THE WITNESS:  Thank you.

12         MR. TELLIS:  I'll pass the witness.

13         THE VIDEOGRAPHER:  Does anybody else have

14    questions?

15         MR. TAYLOR:  This is Will Taylor with

16    Experian.  Skip, I don't know if you had anything

17    but I did have a couple of questions.

18         MR. KOHLMYER:  I don't have any questions.

19    I'll wait to follow up with you.  I don't have

20    any at this time.

21                   CROSS-EXAMINATION

22    BY MR. TAYLOR:

23    Q.  Well, good afternoon, Mr. Brennan.  My name

24    is Will Taylor.  As I stated before, I represent

25    Experian Information Solutions, Inc., in this

Patrick Brennan

```
 1    lawsuit, the codefendant.  I wanted to just ask you
 2    a couple of quick questions related to the concept
 3    of reaging that was discussed at the beginning of
 4    the testimony.
 5         Now, do you have an understanding of how
 6    long a collection account can report on a consumer
 7    report?
 8    A.   It's typically --
 9         MR. TELLIS:  Objection.  Object to form.
10    A.   It's typically seven years from the date of
11    delinquency.
12    Q.   And have you heard of that referred to as an
13    account aging off a report based on how long it's
14    been reporting?
15         MR. TELLIS:  Object to form.
16    A.   Yes.
17    Q.   Now, the accounts at issue in this case for
18    plaintiff Santos and Clements were collection
19    accounts, correct?
20    A.   Yes.
21    Q.   And do you understand that when an account
22    ages off a consumer report and is no longer
23    reported, it is based off of a specific date that is
24    provided by the furnisher?
25         MR. TELLIS:  Object to form.
```

Patrick Brennan

```
 1      A.    That's my understanding, yes.

 2      Q.    Thank you.  And which date is that?

 3      A.    The date of delinquency.

 4      Q.    Okay.  And I think we saw a couple

 5   references to the date of delinquency in some of

 6   HRRG's internal documents, I think it was Exhibit 7.

 7   Is it your understanding that the date of

 8   delinquency for both plaintiffs Santos and Clements

 9   never changed?

10      A.    That's correct.

11      Q.    And is it your understanding that modifying

12   the date of first delinquency or the date of

13   delinquency can affect when the account ages off?

14      A.    Yes.

15            MR. TELLIS:  Object to form.

16      Q.    And modifying that date of delinquency is

17   known as reaging, is that your understanding?

18      A.    Yes.

19      Q.    And that's not what's at issue in this case,

20   correct?

21            MR. TELLIS:  Object to form.

22      A.    Correct.

23      Q.    Rather, plaintiffs are disputing the date of

24   status and the date of first delinquency as they

25   appear on a consumer disclosure that goes only to a
```

Patrick Brennan

```
 1    consumer.  Is that your understanding?

 2        A.   I believe it's date of status and first

 3    reported date.

 4        Q.   Oh, excuse me.  Yeah.  So let me reask that.

 5             So instead, what's at issue in this case is

 6    the date of status and the date first reported that

 7    appear on a consumer disclosure that goes only to a

 8    consumer; is that correct?

 9        A.   Correct.

10        Q.   And to your knowledge, does the date of

11    status or the first reported date affect or have any

12    impact on when an account ages off of a consumer

13    report?

14        A.   Not to my knowledge, no.

15             MR. TAYLOR:  I have no further questions.

16                   REDIRECT EXAMINATION

17    BY MR. TELLIS:

18        Q.   Okay.  I've got some questions.  Have you

19    ever seen, Mr. Brennan, any of the credit repots for

20    the plaintiffs in this case?

21        A.   No, I haven't.

22        Q.   Let me -- let me show you a couple.  Let's

23    take a look at Exhibit 12.

24             (Brennan Exhibit 12 was marked for

25    identification.)
```

Patrick Brennan

```
 1     BY MR. TELLIS:

 2        Q.    I've put on the screen a document produced

 3     by Experian Bates numbered Clements-Exp 00022

 4     through 51, and in the heading it says:  "In

 5     response to your recent request, we're pleased to

 6     send you this credit report."

 7           Do you see that?

 8        A.    I do.

 9        Q.    Okay.  And if we scroll down, let's take a

10     look at page 4 of 30.  Okay.  Do you see at the top

11     of the page here there is an account associated with

12     ARS, it's Account Number 71788939?

13        A.    Yes.

14        Q.    And to the right of it there are some dates:

15     Date opened, March 2013.  First reported date, July

16     2017.  Date of status, July 2017.

17           Do you see that?

18        A.    I see it.

19        Q.    Okay.  And you testified earlier that

20     typically you report accounts to the credit

21     reporting agency within 60 days of obtaining it,

22     right?

23        A.    Approximately 60 days, yes.

24        Q.    Okay.  And so do you know on this column

25     what date opened refers to?
```

Patrick Brennan

1          MR. KOHLMYER:  Object to form.  You can

2    answer if you know.

3    A.   The date opened is the date that the account

4    was placed for collection with us.

5    Q.   And then it says here "First report date,

6    July 2017."  Do you see that?

7          MR. KOHLMYER:  Object to form.

8    A.   I do see it.

9    Q.   Some four years later; is that correct?

10   A.   That's what it says, yes.

11   Q.   Does that appear correct to you?

12         MR. KOHLMYER:  Object to form.

13   A.   No.

14   Q.   Okay.  And then do you see the date of

15   status below that, it says July of 2017?

16   A.   Yes, I see that.

17   Q.   Okay.  Is it your expectation that those two

18   dates would never change?

19         MR. KOHLMYER:  Object to form.

20   Q.   The date of first report and the date of

21   status?

22         MR. KOHLMYER:  Same objection.

23   A.   My understanding is the first reported date

24   should not change.  A date of status I can see

25   changing because it's the date that the status was

Patrick Brennan

```
 1    updated.

 2        Q.   What is your understanding of what date of

 3    status means?

 4             MR. KOHLMYER:  Object to form.

 5        Q.   As Experian uses it?

 6             MR. KOHLMYER:  Object to form.

 7        A.   Experian would have to answer that, but my

 8    understanding is that's the last date that the

 9    information was updated.

10        Q.   Okay.  Do you see underneath "Payment

11    History" here there is a 2017 July and it says C?

12        A.   Yes, I see it.

13        Q.   And C refers to what, do you know?

14             MR. KOHLMYER:  Object to form.

15        Q.   Here is a history legend on page 24 and we

16    see C says "Collection."  Do you see that?

17        A.   I see it, yes.

18        Q.   Is it odd to you that an account payment

19    history would show collection in 2017 that was first

20    reported delinquent in 2013?

21             MR. KOHLMYER:  Object to form.

22        A.   I -- it does seem odd, yes.

23        Q.   Okay.  Now, this is for Account Number

24    71788939.  Do you see that?

25        A.   Yes.
```

Patrick Brennan

```
 1        Q.   And this is dated July 25th, 2017.  Do you

 2   see that?

 3        A.   I'm sorry.  Where are you seeing that date?

 4        Q.   Up here below "Amanda Clements," top

 5   right-hand side of the page, this credit report date

 6   up here in the top right hand corner.

 7        A.   I just had to scroll it.  Yes, I see it.

 8             (Brennan Exhibit 13 was marked for

 9   identification.)

10   BY MR. TELLIS:

11        Q.   Okay.  So now with those dates in mind,

12   let's take a look at another exhibit, which is

13   Exhibit 13, and I'm showing you what I'm marking as

14   Exhibit 13, which is Amanda Clements' credit report

15   dated a month or so later, August 22nd, 2017, Bates

16   number beginning on 000054.  Do you see that?

17        A.   Yes.

18        Q.   And if we scroll down to find that same

19   account number, we see here on page 4, do you see

20   the account number is 71788939?

21        A.   Yes, I see it.

22        Q.   And now the first reported date says August

23   2017, whereas the previous report showed July of

24   2017.  Do you see that?

25        A.   Yes.
```

Patrick Brennan

1    Q.   Does that appear correct to you?

2         MR. KOHLMYER:  Object to form.

3    A.   No.

4    Q.   Okay.  And down here under "Payment

5    History," we see only August, whereas the prior

6    report showed July, and it says Collections, August.

7    Do you see that?

8    A.   Yes, I see it.

9    Q.   It appears there is no entry here for the

10   July collection activity, right?

11   A.   It would appear so, yes.

12   Q.   Okay.  Does that look like it's correct to

13   you?

14        MR. KOHLMYER:  Object to form.

15   A.   No.

16        MR. TELLIS:  Okay.  No further questions.

17        MR. TAYLOR:  I just have one follow-up.

18        MR. KOHLMYER:  Go ahead.  Go ahead, Will.

19        MR. TAYLOR:  Sorry?

20        MR. KOHLMYER:  Go ahead, Will.

21             RECROSS-EXAMINATION

22   BY MR. TAYLOR:

23   Q.   Okay.  Just one question:  Mr. Brennan, do

24   you understand that with respect to Exhibits 12 and

25   13, that these are consumer disclosures that go only

Patrick Brennan

```
 1    to the consumer as opposed to a document or
 2    information that is sent to a third-party creditor?
 3         MR. KOHLMYER:  Object to form.  You can
 4         answer if you know.
 5    A.   I do understand that, yes.
 6         MR. TAYLOR:  No further questions.
 7                   CROSS-EXAMINATION
 8    BY MR. KOHLMYER:
 9    Q.   I've just got one.  Is this a document
10    that -- and the information provided that was
11    discussed regarding the entries of first reported
12    date and date of status, was this document produced
13    by HRRG?
14         MR. TELLIS:  No.  It's Bates numbered
15         Clements-Exp, indicating it was produced by
16         Experian.
17         MR. KOHLMYER:  No, that was a question to my
18         client.
19         MR. TELLIS:  Oh, I'm sorry.  I'm sorry.
20         MR. KOHLMYER:  Your answer is even probably
21         more persuasive, so I'll just leave it at that.
22         I'll withdraw the question.  That's what --
23         MR. TELLIS:  I apologize, Counsel.  I
24         thought you were asking for a clarification.
25         MR. KOHLMYER:  That's okay.  You gave the
```

Patrick Brennan

1     right answer.  Thanks.

2          No, I'll have my client read if the

3     transcript is ordered.

4          MR. TELLIS:  Okay.  Very good.  Thank you.

5          THE VIDEOGRAPHER:  The time is 1:13.  We are

6     now off the record.

7          (Whereupon, the deposition concluded at

8     1:13 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2         I, Susan D. Wasilewski, Registered

 3   Professional Reporter, Certified Realtime Reporter,

 4   Certified Manager of Reporting Services, Certified

 5   Realtime Captioner, and Florida Professional

 6   Reporter, hereby certify that the witness named

 7   herein appeared remotely on Thursday, May 21, 2020,

 8   and was duly sworn.

 9         I FURTHER CERTIFY that I was authorized to

10   and did stenographically report the examination of

11   the witness named herein; that a review of the

12   transcript was requested; and that the foregoing

13   transcript is a true record of my stenographic

14   notes.

15         I FURTHER CERTIFY that I am not related to

16   or an employee of any of the parties, nor am I

17   related to or an employee of any of the parties'

18   attorneys or counsel connected with this action, nor

19   am I financially interested in the outcome of this

20   action.

21         WITNESS my hand this 27th of May, 2020.

22

23   _____

24      Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

Patrick Brennan

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4            Please read your deposition over carefully

 5      and make any necessary corrections.  You should

 6      state the reason in the appropriate space on the

 7      errata sheet for any corrections that are made.

 8

 9            After doing so, please sign the errata sheet

10      and date it.  It will be attached to your

11      deposition.

12

13            It is imperative that you return the

14      original errata sheet to the deposing attorney

15      within thirty (30) days of receipt of the deposition

16      transcript by you.  If you fail to do so, the

17      deposition transcript may be deemed to be accurate

18      and may be used in court.

19

20

21

22

23

24

25
```

```
 1                         - - - - - -

 2                        E  R  R  A  T  A

 3                         - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6       REASON: _____

 7    _____   _____   _____

 8       REASON: _____

 9    _____   _____   _____

10       REASON: _____

11    _____   _____   _____

12       REASON: _____

13    _____   _____   _____

14       REASON: _____

15    _____   _____   _____

16       REASON: _____

17    _____   _____   _____

18       REASON: _____

19    _____   _____   _____

20       REASON: _____

21    _____   _____   _____

22       REASON: _____

23    _____   _____   _____

24       REASON: _____

25
```

Patrick Brennan

```
 1                 ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4     acknowledge that I have read the foregoing pages, 1

 5     through 115, and that the same is a correct

 6     transcription of the answers given by me to the

 7     questions therein propounded, except for the

 8     corrections or changes in form or substance, if any,

 9     noted in the attached Errata Sheet.

10

11

12     _____        _____

13     PATRICK BRENNAN                                    DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20____.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24

25
```